Ms. Barbara HAYES, Ms. Cerise Jones, Ms. Marion Brown, Ms. Regina Campbell, on behalf of themselves and on behalf of all persons similarly situated, Plaintiffs,

v.

CITY UNIVERSITY OF NEW YORK, a body corporate; Robert J. Kibbee, Chancellor of the City University of New York; Leo A. Corbie, University Dean for Special Programs; Human Resource Administration of the City of New York; Stanley Brezenoff, Commissioner of the Human Resources Administration; Howard Miller, Jr., Budget Director of the State of New York; Arthur N. Gordon, Acting Director of the New York City Audit Bureau; New York State Department of Social Services; Barbara B. Blum, Commissioner of New York State Department of Social Services, Defendants.

Ana VILLANUEVA, on her own behalf and on behalf of all others similarly situated, Plaintiff,

v.

Patricia Roberts HARRIS, as Secretary of the United States Department of Health and Human Services; Barbara Blum, as Commissioner of the New York State Department of Social Services; and Stanley Brezenoff, as Commissioner of the New York City Department of Social Services, Defendants.

Carmen WARREN and Michelle Warren, Plaintiffs,

v.

Stanley BREZENOFF, Individually and as Commissioner of the New York City Department of Social Services; Barbara Blum, Individually and as Commissioner of the New York State Department of Social Services; Patricia Roberts Harris, Individually and as Secretary of the United States Department of Health and Human Services; Ernest L. Boyer, Individually and as Commissioner of the Office of Education; and Shirley Hufsted-

ler, Individually and as Secretary of the Department of Education, Defendants.

Nos. 77 Civ. 5476 (ADS), 79 Civ. 2433 (ADS) and 80 Civ. 2613 (ADS).

United States District Court, S. D. New York.

Nov. 7, 1980.

On Motion for Stay Pending Appeal Jan. 14, 1981.

George E. Hairston, N.A.A.C.P., New York City, for plaintiffs, Barbara Hayes, Cerise Jones, Marion Brown, Regina Campbell.

John C. Gray, Jr., Brooklyn Legal Services Corp. B, Brooklyn, N.Y., for plaintiff, Ana Villanueva by Gretchen L. Sprague, Brooklyn, N.Y.

Janet M. Calvo, Washington Square Legal Services, Inc., New York City, for plaintiffs, Carmen Warren & Michelle Warren.

John S. Martin, Jr., U. S. Atty., S. D. New York, New York City, for the Federal defendants by Richard Papper, Asst. U. S. Atty., New York City.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for the State defendants by Robert A. Forte, Asst. Atty. Gen., New York City.

Allen G. Schwartz, Corp. Counsel, City of New York, New York City, for the City defendants by Judith A. Levitt, Asst. Corp. Counsel, New York City.

Laura Blank, Bd. of Higher Ed., New York City, for defendant City University of New York.

SOFAER, District Judge:

These consolidated cases arise out of a complex array of statutes and regulations that regulate the level at which students on welfare, or from families on welfare, are to be supported by public funds. The New York State Department of Social Services ("DSS") contends that some welfare students and their families receive more than they need under relevant welfare standards. DSS therefore seeks to reduce the support given such students by the State of New York to the level of need established by DSS directives. Plaintiffs in these cases contend, however, that welfare students' benefits do not exceed their need, as defined by controlling educational standards. Plaintiffs request invalidation of DSS's regulations and practices to the extent that DSS seeks to reduce the level at which welfare students are supported. They are joined in their contentions by the former Department of Health, Education and Welfare ("HEW"), now known as the Department of Health and Human Services.

The issues posed in these cases are far more difficult to relate and comprehend than to resolve. The federal government's decision to support needy students has led to that awesome proliferation of programs, statutes, and regulations that we have come to expect when our nation tackles a social objective. New York's decision to assist needy students has added more programs and greater complexity. Describing these programs and rules is cumbersome, and comprehending their operation is difficult.

Nevertheless, the essence of this dispute can be succinctly stated and readily understood. If left to operate without interference, the various federal and state educational programs available to needy students in New York would treat all such students identically, irrespective of whether they are supported by welfare. Federal and state educational programs treat all students—both welfare and non–welfare–alike by establishing a standard of need that includes both educational and some living costs, and by allocating grants and loans in accordance with that standard. One consequence of this equality of treatment is that federal and state educational grants place students on welfare in a somewhat more favorable position than welfare recipients who are not students. The DSS opposes this situation.

It seeks here, in a variety of ways, to reduce its own allocations to welfare students or their families so that they are supported at a level no higher than that of non-student recipients—even if the consequence is to place welfare students at a disadvantage relative to non–welfare students.

■ The Department's position must be rejected. Congress has clearly indicated it intention, first, that students be treated alike, whether or not on welfare, and, second, that the level of need for students be established by educational authorities, whose goal is to help students succeed, rather than by welfare authorities, who may tend to seek to support at the subsistence level as many recipients as possible. *See* Memorandum of Law in Support of State Defendants' Motion for Summary Judgment at 20, 22.

Contrary to DSS's assertions, invalidation of its policy will not result in welfare students receiving more than they "need." Federal law provides ample means for preventing students from obtaining more support than educational authorities determine they need to succeed as students. What this decision does mean is that welfare students must be allowed to keep those funds determined by educational authorities to be educationally necessary; these students may not be deprived of any part of that support by welfare authorities concerned primarily with what they need to subsist as recipients.

■ Congress, in short, has evidenced a desire to provide extra support to all needy students, including those on welfare, in the belief that the extra margin will enable many such students to break the cycle of poverty and despair, thereby saving public funds in the long run. *See generally* Senate Report No. 673, 89th Cong., 1st Sess.,

reprinted in [1965] U.S.Code Cong. & Ad. News, pp. 4027, 4053–62. State welfare officials may not interfere with this important national policy.

I. *Federal and State Educational Assistance Programs*

Congress has developed a multifaceted scheme of programs to assist financially needy students in obtaining post–secondary educations. *See* Higher Education Act of 1965, Title IV, Pub.L. 89–329, 20 U.S.C. §§ 1070–1089. It has vested overall responsibility for the various aid programs in the Commissioner (now the Secretary) of Education, but the individual educational institutions play the critical role in the federal educational assistance system. Acting pursuant to federal regulations, each participating institution administers the federal programs for its students by constructing individual aid packages. To participate in the federal programs, the institution must agree to comply with governing statutes and regulations.

The financial aid package is built upon the so–called Basic Grant. Basic Educational Opportunity Grant program ("BEOG"), 20 U.S.C. § 1070a; 45 C.F.R. Part 190 (1979). Determining the amount of that grant entails two steps. First, the student applies for aid to the Commissioner of Education. The Commissioner calculates the applicant's expected family contribution[1] and issues a student eligibility report, which specifies the proportion of the maximum BEOG award that the applicant may receive. 45 C.F.R. §§ 190.11–190.16 (1979). The applicant then submits the student eligibility report to the financial aid office at the student's school for calculation of the actual grant.[2] *Id.* §§ 190.61–190.67. That office determines the student's cost of at-

---

1. The computation of expected family contribution is based upon a nationally uniform needs analysis prescribed by the Commissioner. 45 C.F.R. §§ 190.31–190.48 (1979). The analysis begins with the applicant's annual adjusted family income, which includes welfare and Social Security benefits. The Commissioner deducts from that amount federal income tax paid, and offsets for family size, unusual ex-

pense, employment expense, and educational expense. The sum is multiplied by 10.5 percent to determine the expected family contribution.

2. If the institution participates in the Alternate Disbursement System, the Commissioner will calculate and pay the award. 45 C.F.R. §§ 190.91–190.96 (1979).

tendance pursuant to a formula promulgated by the Commissioner having three elements: tuition and fees, room and board, and a $400 allowance for books, supplies, and miscellaneous expenses. *Id.* §§ 190.51–190.55. The financial aid office then awards a grant of whichever of the following amounts is smallest: the difference between $1800 and the expected family contribution; 50 percent of the cost of attendance; or the difference between the cost of attendance and the expected family contribution. *Id.* §§ 190.62–190.63. The grant may never exceed one–half of the student's financial need, with an absolute maximum of $1800.

If the Basic Grant fails to satisfy the student's educational costs, the financial aid office completes the student's package with additional federal and state grants and loans. Among the federal programs are the Supplemental Educational Opportunity Grant program ("SEOG"), 20 U.S.C. § 1070b; 45 C.F.R. Part 176 (1979), the Guaranteed Student Loan Program ("GSLP"), 20 U.S.C. § 1071; 45 C.F.R. Part 177 (1979), the National Direct Student Loan program ("NDSL"), 20 U.S.C. § 1087aa; 45 C.F.R. Part 174 (1979), and the College Work Study program ("CWS"), 42 U.S.C. § 2751; 45 C.F.R. Part 175, Subpart

A (1979). The state programs include the Tuition Assistance Program ("TAP"), the Search for Education, Elevation and Knowledge program ("SEEK"), and the College Discovery program ("CD").

Calculating need for purposes of these federal and state programs differs from calculating the BEOG. The cost of education includes tuition and fees, room and board, books and supplies, transportation, miscellaneous personal expenses, and expenses for the support of the student's dependents. *Id.* §§ 174.11, 175.11, 176.11. These expenses are based upon Bureau of Labor Statistics data on the cost of living at the low–moderate standard of living. The cost budget is submitted for approval by the Commissioner of Education. TAP awards are given to defray tuition for needy and able students.[3] SEEK and CD awards are for supplementary assistance, and are based on the same cost of living standard used in distributing federal funds.[4]

The regulations also specify several sources of income that must be considered in calculating the student's available resources. *Id.* §§ 174.14, 175.14, 176.14. The student's financial need is the difference between his cost of education and his expected family contribution. In calculating

---

**3.** The State of New York created the Tuition Assistance Program in 1974. N.Y.Educ.Law § 667 (McKinney Supp. 1979). The program is administered by the New York State Higher Education Services Corporation ("HESC"). TAP grants are available to students enrolled in approved programs who demonstrate the ability to complete their courses. The TAP award may not exceed the amount of tuition, *id.* § 667(1), nor may it exceed the difference between tuition and "all other state, federal, or other educational aid that is received . . . by such student . . . and that, in the judgment of the Commissioner, would duplicate the purposes of the tuition assistance award," *id.* § 667(3)(c), (4)(e)(2).

**4.** The SEEK program was created by the New York State Legislature in 1966 "to advance the cause of equality of educational opportunity" at the City University of New York ("CUNY"). 1966 N.Y.Laws Ch. 782, § 13.1. The College Discovery Program was instituted by the New York City Board of Higher Education in 1964 in order to assist impoverished students who had the potential to complete a college education.

N.Y.C. Bd. of Higher Educ. Minutes, Feb. 17, 1964 (Cal. No. 6). The CD program made available intensive counselling, remedial assistance, and financial stipends. In adopting the Higher Education Opportunity Program in 1969, the New York Legislature formalized supplemental educational assistance programs such as SEEK and CD. N.Y.Educ.Law § 6452 (McKinney 1972). The statute directed the State University of New York and CUNY to provide special educational programs to economically and educationally disadvantaged students with the potential for completing post–secondary education. *Id.* § 6452(1). The institutions were authorized to provide "[a]ny necessary supplemental financial assistance, which may include the cost of books and necessary maintenance . . . ." *Id.* § 6452(4)(a)(v). Such assistance must be furnished pursuant to criteria promulgated by the institution and approved by the Regents and the Director of the Budget. Since 1970, CUNY has continued the SEEK and CD programs throughout its campuses.

that contribution, the office must apply either the figure used by the Commissioner in determining the BEOG or a method of analysis approved by the Commissioner. *Id.* §§ 174.12, 174.13, 175.12, 175.13, 176.12, 176.13.

One feature of these assistance programs is especially relevant to this litigation: the safeguards against excessive awards. Every institution must appoint a coordinating official for its federal and nonfederal financial aid programs. Federal regulations forbid an institution from awarding NDSL, CSW, or SEOG if the award, in conjunction with all other resources, will exceed the student's need. Should the student's financial aid for any reason exceed his needs, the institution must adjust the financial aid to eliminate the excess. *Id.* §§ 174.14, 175.14, 176.14.

### II. *The Current Litigation*

These three consolidated cases center on the validity of an Administrative Letter of the Department of Social Services that governs the interplay between welfare provisions and federal and state educational assistance programs. Title IV of the Social Security Act, known as Aid to Families with Dependent Children, 42 U.S.C. §§ 601–644, provides financial assistance to needy dependent children and the parents or relatives who live with or care for them. The AFDC program is funded largely by the federal government, but is administered by the states. Participating states must submit plans that conform to the Act and regulations promulgated by HEW in order to receive federal funds; failure to comply may result in termination of federal funding. *Id.* § 604(a).

In determining an applicant's eligibility for AFDC benefits and the level of his assistance, the state must take into account the income and resources available to him. *Id.* § 602(a)(7); 45 C.F.R. § 233.20(a)(1), (a)(3)(ii) (1979); *see* 18 N.Y.C.R.R. § 352.-16(a) (1979). Not all income, however, is to be considered in determining need; several types of funds are excluded from the definition of income. 45 C.F.R. § 233.20(a)(3)(iv), (a)(4)(ii) (1979).

Two of the exclusions are at the core of this litigation. The first will be referred to as the "restricted–aid exclusion." The applicable HEW regulation requires:

> A State plan for ... AFDC ... must ... (iv) Provide that, in determining the availability of income and resources, the following will not be included as income: ... (b) loans and grants, such as scholarships, obtained and used under conditions that preclude their use for current living costs. ...

*Id.* § 233.20(a)(3)(iv)(b). New York's DSS has adopted a corresponding regulation:

> No part of a scholarship, grant or other such income that is necessary to cover the cost of necessary or essential school expenses (e. g., tuition, books, fees, equipment, special clothing needs, transportation to and from school, and childcare services necessary for school attendance), and is actually so used, shall be considered as income in determining need and amount of assistance.

18 N.Y.C.R.R. § 352.16(d)(1) (1979).

The second provision, referred to herein as the "federal–aid exclusion," states as follows:

> A State plan for ... AFDC ... must ... (ii) Provide that, in determining eligibility for public assistance and the amount of the assistance payment, the following will be disregarded as income and resources: ... (d) Any grant or loan to any undergraduate student for educational purposes made or insured under any programs administered by the Commissioner of Education ....

45 C.F.R. § 233.20(a)(4)(ii)(d) (1979). Promulgation of that regulation was required by Congress in section 507 of the Higher Education Amendments of 1968, Pub.L. 90–575, 82 Stat. 1063 (1968). DSS has adopted a virtually identical regulation. 18 N.Y.C.R.R. § 352.16(d)(2) (1979).

Prior to December 30, 1977, interpretation of this DSS regulation was governed by DSS Administrative Letter 75 ADM–89 (Aug. 22, 1975). That letter provided that

federal educational grants or loans (*i. e.*, BEOG, SEOG, CWS, NDSL, GSLP) "should not be considered as income or resources in determining need and amount of assistance." Other grants (*e. g.*, TAP, SEEK, and CD) were to be applied against the student's school expenses; any excess was to be treated as income. Welfare officials respected the CUNY standard student expense budget, treating the difference between the standard public assistance budget and the standard CUNY financial budget as educational expenses.

On December 30, 1977, the Department modified its policy. It issued DSS Administrative Letter 77 ADM–134 (Dec. 30, 1977) to ensure that AFDC recipients' educational assistance "be properly treated." The directive required local departments of social services to determine whether any portion of a recipient's educational funds "is a resource available to reduce or eliminate the need for public assistance and care." It divided student AFDC recipients into three categories. If a student receives only federal assistance, the total amount is exempt irrespective of educational expenses. If a student receives only non–federal assistance, the amount by which that sum exceeds necessary and essential school expenses is treated as an available resource. Finally, if the student receives both federal and state resources–the category upon which these cases focus–the directive provides that any non–exempt educational aid not necessary to meet school expenses should be treated as available to reduce or eliminate the need for public assistance.

> If the student receives monies from federally administered or insured programs as well as other sources, necessary and essential school expenses are applied against *total* amount of the monies received for educational purposes. When such monies are in excess of expenses, the expenses are applied first against the exempt monies (i. e. funds from federally administered program) and then against non–exempt monies. Any balance which represents funds from non–exempt programs or other sources are an available resource which must be utilized to reduce or eliminate the need for public assistance and care.

*Id.* at 3 (emphasis in original).

This change, by itself, would not necessarily have led to any difference in the level of support given recipient students and their families. But a second change occurred at or near the time of the directive's issuance. Previously, DSS had respected the CUNY standard financial aid budget as to what constituted necessary educational expense. After adopting 77 ADM–134, DSS began to use its own figures in calculating which expenses are "necessary and essential" for purposes of determining available income. *See* Memorandum of Law in Support of State Defendants' Motion for Summary Judgment at 20. The difference between these two budgets– CUNY's and DSS's–accounts for the persistent findings by DSS that students have excess educational assistance that can be applied to reduce AFDC benefits.

Despite their factual differences, the three cases considered here share a common critique of the DSS policy promulgated in 77 ADM–134. Plaintiffs in *Hayes,*[5] *Villan-*

---

5. *Hayes v. City University of New York* was brought as a class action in the Southern District in 1977. Plaintiffs were CUNY students who received AFDC as well as SEEK and CD stipends. The original complaint challenged the 1977–78 CUNY financial aid budget for students on AFDC, under which students would have received SEEK and CD stipends for books and supplies, transportation, student lunches, and child care services, but would no longer have received assistance for housing, food, clothing, personal, and medical expenses. On November 14, 1977, Judge Kevin T. Duffy temporarily restrained CUNY from implement-

ing the new budget. CUNY thereafter voluntarily refrained from reducing plaintiffs' financial aid stipends, thus mooting the claim against CUNY.

On December 30, 1977, DSS adopted its new administrative directive. In response, plaintiffs amended their complaint in March 1978 to add DSS and its Commissioner as defendants. The amended complaint alleged that 77 ADM–134 violated numerous federal statutory and constitutional provisions. Plaintiffs moved for a preliminary injunction to prevent CUNY, DSS, and the New York City Human Resources Administration from implementing the new policy. On

ueva,[6] and *Warren*[7] contend that the policy violates the Social Security Act and regulations in three respects: by including exempt federal educational assistance funds in the calculation of a recipient's income; by including restricted state educational assistance funds in the income calculation; and by interfering in the federal educational assistance program through the recalculation of educational expenses.[8] Plaintiffs also contend that 77 ADM–134 violates the equal protection and due process clauses of the federal constitution, but these claims need not be reached, for plaintiffs are entitled to summary judgment on their statutory claims.

### III. *Failure to Disregard Federal Funds*

Plaintiffs' first contention is that 77 ADM–134 violates federal statutes and regulations in that it fails to disregard federal educational funds in calculating a recipient's income. The governing statute provides that, for the purpose of *inter alia* the AFDC program, "no grant or loan to any undergraduate student for educational purposes made or insured under any program administered by the Commissioner of Education shall be considered to be income or resources." Higher Education Amendments of 1968, § 507, Pub.L. 90–575, 82 Stat. 1063 (1968). Pursuant to federal regulation, every state that participates in the AFDC program must:

[p]rovide that, in determining eligibility for public assistance and the amount of the assistance payment, the following will be disregarded as income and resources: . . . (d) Any grant or loan to any undergraduate student for educational purposes made or insured under any pro-

---

July 5, 1978, Judge Duffy denied that motion. He did not rule on the likelihood of success on the merits, but instead relied upon the absence of a showing of irreparable harm. *Hayes v. City University of New York,* 454 F.Supp. 1118 (S.D.N.Y.1978). In January 1979, defendants moved to dismiss the complaint, contending that *Lumpkin v. Department of Social Services,* 45 N.Y.2d 351, 408 N.Y.S.2d 421, 380 N.E.2d 249 (1978), *appeal dismissed,* 439 U.S. 1040, 99 S.Ct. 713, 58 L.Ed.2d 700 (1979), had disposed of the issues raised in *Hayes.* Judge Duffy denied the motion to dismiss on the ground that *Lumpkin* did not dispose of all the issues before the court. Memorandum & Order, *Hayes v. City University of New York,* 77 Civ. 5476 (KTD) (April 30, 1979). Four of the eight claims in plaintiffs' amended complaint have been dropped.

6. *Villanueva v. Harris* was filed in the Eastern District of New York in April 1979. The named plaintiff is an AFDC recipient whose benefits are to be reduced because of federal and state educational assistance received by her daughter, a student at CUNY. Plaintiff brought the suit as a class action against New York welfare officials to enjoin them from implementing 77 ADM–134. Plaintiff also named the Secretary of HEW as a defendant on the ground that the Secretary was obligated to suspend AFDC funding to New York because of the new policy. Judge Charles P. Sifton temporarily restrained the state welfare officials from reducing plaintiff's AFDC grant, and those officials have extended that stay pending disposition of this suit. The case was transferred to this Court on April 26, 1979 for consolidation with *Hayes.*

7. *Warren v. Brezenoff* was brought in the Southern District in May 1980 by an AFDC recipient and her daughter, a CUNY student who receives federal and state educational assistance grants. They challenge, on constitutional and federal and state statutory grounds, the recomputation of plaintiffs' AFDC benefits pursuant to 77 ADM–134. Defendants are state and local welfare officials and federal officials responsible for AFDC and educational assistance programs. The case was consolidated with *Hayes* and *Villanueva* by agreement of the parties.

8. Plaintiffs also suggest in their papers that 77 ADM–134 violates the requirement that an AFDC recipient's income and resources must be "reasonably evaluated." 45 C.F.R. § 233.-20(a)(3)(ii)(E) (1979). Given the parties' cursory treatment of this claim, it is not entitled to consideration.

Plaintiffs in *Hayes* press one claim not advanced in the other cases: that CUNY's release to welfare officials of identifying characteristics (*e. g.,* name, social security number, address) of students enrolled in the SEEK and CD programs violated their rights under the Family Educational and Privacy Rights Act of 1974, 20 U.S.C. § 1232g. We need not decide whether that Act creates a private right of action, for it expressly exempts disclosures made "in connection with a student's application for, or receipt of, financial aid." *Id.* § 1232g(b)(1)(D). Plaintiffs' claim that this disclosure violated the constitutional right to privacy is so casual and undeveloped as not to merit adjudication.

grams administered by the Commissioner of Education . . . .

45 C.F.R. § 233.20(a)(4)(ii)(d) (1979).

The legislative history of the federal–aid exclusion is sparse.[9] But two policies behind section 507 can readily be discerned. The first is to prevent state interference with federal education assistance programs. The history of the 1968 Amendments—in fact, the history of nearly all federal educational assistance programs—reflects a pervasive concern over the inability of many Americans to attend college because of its exorbitant cost. These programs endeavor to enable middle– and lower–income students to obtain an education that might otherwise be beyond their grasp. If welfare officials were permitted to treat these funds as additional income to AFDC recipients, the purpose of federal assistance programs could be frustrated. What the federal government put into one pocket, the state could take out of the other.

Congress has excluded several other sources of income, such as some types of earned income, from calculation of a recipient's need and has required deduction of expenses incurred in the earning of income. *See* 42 U.S.C. § 602(a)(7); 45 C.F.R. § 233.-20(a)(3)(iv) (1979). As with the federal–aid exclusion, the purpose of these exclusions is to bar state–created disincentives to activities favored by Congress. The courts have been quick to strike down such disincentives. *See, e. g., Shea v. Vialpando,* 416 U.S. 251, 264–65, 94 S.Ct. 1746, 1755–1756, 40 L.Ed.2d 120 (1974) ("Standardized treatment of employment related expenses without provision for demonstrating actual and reasonable expenses . . . threatens to defeat the goal Congress sought to achieve in adopting the mandatory work–expense recognition provisions . . . [T]he regulation results in a disincentive to seek or retain employment . . . and is therefore invalid."); *Elam v. Hanson,* 384 F.Supp. 549, 553 (N.D.

Ohio 1974) (inclusion of OASDI funds in income invalid as discouraging recipients from seeking higher education); *Brown v. Bates,* 363 F.Supp. 897, 902–03 (N.D.Ohio 1973) (inclusion of CWS funds in income invalid as disincentive to working for education).

A second purpose of section 507 appears to be to preserve the joint federal–state structure of the AFDC program. AFDC is not funded entirely by the federal government; rather, participating states must share in the costs of the program. Section 507 prevents a state from evading its responsibility by tapping federal educational funds to supplant its own contribution.

Moreover, the language of the governing regulation is highly instructive. With respect to other exclusions, such as the restricted–aid exclusion, HEW requires that particular resources "will not be included as income" in the computation of a recipient's income and resources. *Id.* § 233.20(a)–(3)(iv). But with respect to the federal–aid exclusion, the regulation requires that federal educational assistance "will be *disregarded* as income and resources*" in determining a recipient's need. *Id.* § 233.-20(a)(4)(ii)(d). The distinction between "not included" and "disregarded" is subtle but important: it signifies that the federal grants must not merely be excluded from the income column, but cannot even be considered in evaluating a recipient's need. In short, state welfare officials must make their calculations as if these funds did not exist.

Both on its face, and in its application to AFDC recipients, 77 ADM–134 violates the federal–aid exclusion. Pursuant to that directive, a welfare official evaluates a recipient's income and resources by applying his educational expenses, as defined by DSS, against the total amount of federal and state aid received. If the total aid exceeds

---

**9.** The provision originated as Section 254 of the Senate bill, but the report merely recited the provision without discussion. S.Rep. No. 1387, 90th Cong., 2d Sess. 72 (1968), U.S.Code Cong. & Admin.News 1968, p. 4035. The House bill contained no comparable provision, but the Conference Committee adopted it as Section 507. H.R.Rep.No.1919, 90th Cong., 2d Sess. 85–86 (1968), U.S.Code Cong. & Admin.News 1968, p. 4035. The provision was not mentioned in the floor debates.

need, the official reduces the recipient's need by the amount of the federal aid; the difference between this reduced need and the state aid is treated as income and reduces the student's AFDC benefits.

Far from disregarding federal funds, this policy takes them fully into account, albeit in a roundabout way. A simple example illustrates. Assume that a student receives $100 in state aid and has an educational need, according to DSS standards, of $150. If that student then receives $100 in federal aid, his AFDC benefits will drop by $50; DSS will offset his educational need by the amount of federal aid, thereby reducing it to $50, against which the state aid will leave an excess of $50. Similarly, if this student had initially received $100 in state aid and $50 in federal, and his federal aid increases by $5, he will have an excess of $5 (for his need will be reduced to $145). Plainly, the amount of resources available for AFDC purposes is directly correlated with the student's federal grants—in violation of the disregard requirement.[10]

As a practical matter, moreover, reductions in a student's AFDC benefits will be covered (to the extent possible) by the student's federal funds. As will be discussed below, the state educational grant (TAP) used by DSS to offset a student's educational need is restricted to payment of tuition. A student does not receive TAP funds; they are sent directly to his college. Therefore, if AFDC is reduced on account of educational assistance, the student must compensate for the reduction by paying living costs with unrestricted funds—namely, the federal grants and loans. *See* note 17 *infra.*

HEW, which is responsible for administration of the AFDC program, and which until recently administered the federal educational assistance programs, agrees that the DSS policy violates the federal–aid exclusion: "As Federal law mandates that Federal grants such as BEOG be totally disregarded, the State is acting in contravention of Federal law." Supplemental Memorandum of Law of Defendant Harris at 15; *see* Affidavit of Florence M. Aitchison, Ex. A (Letter from HEW Assistant Regional Commissioner, Office of Family Assistance, to Commissioner Barbara B. Blum, N.Y. DSS, Oct. 19, 1979).[11] The courts have repeatedly recognized—particularly in the context of the Social Security Act—that "the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong ...." *New York Department of Social Services v. Dublino*, 413 U.S. 405, 421, 93 S.Ct. 2507, 2516–2517, 37 L.Ed.2d 688 (1973) (citations omitted); *accord, McGraw v. Berger*, 537 F.2d 719, 725 (2d Cir. 1976), *cert. denied*, 429 U.S. 1095, 97 S.Ct. 1110, 51 L.Ed.2d 542 (1977).

The principal basis upon which DSS defends its directive is *stare decisis*. DSS contends that the New York Court of Appeals disposed of this challenge in *Lumpkin v. Department of Social Services*, 45 N.Y.2d 351, 408 N.Y.S.2d 421, 380 N.E.2d 249 (1978), *appeal dismissed*, 439 U.S. 1040, 99 S.Ct. 713, 58 L.Ed.2d 700 (1979). Plaintiffs in *Lumpkin* attacked the portion of 77 ADM–134 that allocated, first, federal assistance, and then state TAP grants, against expenses in calculating whether excess income was available to offset against AFDC need. That Court unquestionably upheld the allocation policy.[12]

---

**10.** A New York decision upholding 77 ADM–134 serves to underscore its inconsistency with the federal–aid exclusion. The Appellate Division held that the agency could validly "*take into consideration* Federal educational grants to AFDC recipients for the purpose of determining funds available for education ...." *Tavarez v. Sipprell*, 62 A.D.2d 631, 638, 405 N.Y.S.2d 531, 535 (4th Dep't 1978) (emphasis added). Taking the funds into consideration is antithetical to the disregard requirement.

**11.** The Aitchison letter acknowledges that HEW had originally approved the policy contained in 177 ADM–134, but explains that the *Villanueva* litigation caused the Department to examine the DSS policy more closely.

**12.** Defendants also cite *Richman v. Juras*, 393 F.Supp. 349 (D.Or.1975) (three–judge court), in support of the DSS policy. *Richman* involved a regulation similar to 77 ADM–134, which the court upheld in a brief opinion. First, that case is factually distinguishable, because the state

■ Nevertheless, *Lumpkin* does not control. The federal–aid exclusion is not a state–law question to which a federal court must defer. The New York courts can authoritatively construe state statutes and regulations, but independent federal inquiry is required into whether those laws violate federal law. *See, e. g., Sola Electric Co. v. Jefferson Co.*, 317 U.S. 173, 176, 63 S.Ct. 172, 173–174, 87 L.Ed. 165 (1942); *United States v. Board of Harbor Commissioners*, 73 F.R.D. 460, 462 (D.Del.1977) (citing cases).

■ The *Lumpkin* decision in fact applied an inappropriate standard in evaluating the DSS allocation policy. The Court stated that the policy must be upheld "if it is not irrational or unreasonable," 45 N.Y.2d at 356, 408 N.Y.S.2d at 423, 380 N.E.2d at 252, whereas the proper test is the policy's consistency with federal law; a wholly rational policy may nevertheless violate federal regulations. Furthermore, *Lumpkin* assumed away the central issue with respect to the federal–aid exclusion by starting "with the premise that either BEOG or TAP awards may properly be allocated to

actual educational expenses." 45 N.Y.2d at 356, 408 N.Y.S.2d at 423, 380 N.E.2d at 252. Given that premise, the order of allocation became trivial.

Finally, *Lumpkin* noted that HEW's approval of 77 ADM–134 was "not without significance." 45 N.Y.2d at 357, 408 N.Y. S.2d at 424, 380 N.E.2d at 252. HEW's subsequent reversal of its initial position undermines *Lumpkin*, insofar as it rests upon HEW's stand. That HEW changed its position does not, as DSS suggests, establish that its current stand is entitled to no weight. The change of position here resulted from the persistent and ultimately successful efforts of plaintiffs' counsel to educate the relevant HEW personnel to the error of their original determination. Defendants cannot substitute *Lumpkin* for reasoned argument, even though the Supreme Court denied an appeal there for want of a substantial question. Most of the considerations that diminish the authoritativeness of the New York Court of Appeals' opinion similarly diminish the significance of the Supreme Court's refusal to review.[13]

grants there were unrestricted and could be used for living costs, *id.* at 351, whereas New York's TAP funds are restricted. Second, that court seems to have assumed that the federal–aid exclusion, 45 C.F.R. § 233.20(a)–(4)(ii)(d), was based upon 42 U.S.C. § 1382a(b)(7), which says nothing about *federal* aid. The court ignored the provision upon which the federal–aid exclusion is actually based, Section 507 of the Higher Education Amendments. Its analysis was thus misdirected. Finally, *Richman* stated that the policy "complies with Regulation 233.-20(a)(4)(ii)(d) *by not considering as income* federal loans and scholarships." 393 F.Supp. at 351 (emphasis added). But, as we have discussed above, the language of the regulation and the policies behind it require welfare officials not merely to refrain from considering such funds as income, but rather to disregard such funds completely.

**13.** This Court recognizes that, whatever their precedental effect on the Supreme Court itself, summary dispositions by the Supreme Court are binding upon lower courts. The Court of Appeals for the Second Circuit has been careful to accord summary dispositions their due weight. *See, e. g., Doe v. Hodgson*, 478 F.2d 537, 539 (2d Cir.), *cert. denied*, 414 U.S. 1096, 94 S.Ct. 732, 38 L.Ed.2d 555 (1973); *Port Authority Bondholders Protective Committee v.*

*Port of New York Authority*, 387 F.2d 259, 262 & n.3 (2d Cir. 1967).

The Supreme Court has offered guidance as to the proper interpretation of a summary disposition:

> [T]he precedential effect of a summary affirmance can extend no further than "the precise issues presented and necessarily decided by those actions." A summary disposition affirms only the judgment of the court below, ... and no more may be read into our action than was essential to sustain that judgment .... Questions which "merely lurk in the record" ... are not resolved, and no resolution of them may be inferred.

*Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 182–83, 99 S.Ct. 983, 989, 59 L.Ed.2d 230 (1979) (citations omitted); *see Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 2241, 53 L.Ed.2d 199 (1977).

The jurisdictional papers in the *Lumpkin* appeal to the Supreme Court (No. 78–608) reveal that the *Lumpkin* dismissal does not dispose of these suits. That appeal did not address plaintiffs' second or third claims, which are alternative grounds for invalidating the DSS directive. The appeal did touch upon plaintiffs' first claim, insofar as it challenged the order of allocation authorized by the DSS policy. But the appellate claim is different from plaintiffs'

■ DSS directive 77 ADM–134 contravenes both Section 507 of the Higher Education Amendments of 1968 and 45 C.F.R. § 233.20(a)(4)(ii)(d) (1979) and is therefore invalid under the supremacy clause. *See Townsend v. Swank,* 404 U.S. 282, 285, 92 S.Ct. 502, 504–505, 30 L.Ed.2d 448 (1971); *Reyna v. Vowell,* 470 F.2d 494, 496 (5th Cir. 1972).

## IV. *Improper Consideration of Restricted State Funds*

Plaintiffs argue that, in its treatment of TAP funds, 77 ADM–134 also violates the restricted–aid exclusion.[14] The governing HEW regulations require that "in determining the availability of income and resources, the following will not be included as income: ... (b) loans and grants, such as scholarships, obtained and used under conditions that preclude their use for current living costs ...." 45 C.F.R. § 233.20(a)(3)(iv)(b) (1979).

The restricted–aid exclusion appears in a provision that also requires states to deduct expenses reasonably incurred by an AFDC recipient in earning income. *Id.* § 233.20(a)(3)(iv)(a). The purpose of both provisions is obvious: to prevent a state from reducing a recipient's benefits on account of income that he cannot actually use to pay the everyday costs of living. In a variety of contexts, the courts have prevented states from treating as available income to a recipient funds that are not actually available. *See, e. g., Shea v. Vialpando,* 416 U.S. 251, 94 S.Ct. 1746, 40 L.Ed.2d 120 (1974) (work expenses); *Lewis v. Martin,* 397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970) (resident non–spouse's contributions); *Reyna v. Vowell,* 470 F.2d 494 (5th Cir. 1972) (children's contributions); *cf.* 45 C.F.R. § 233.20(a)(3)(ii)(D) (1979) (income is to be considered available only "when actually available").

The restricted–aid exclusion is consistent with this pervasive theme of the AFDC program. If an educational assistance grant cannot be used by a student for current living costs, then reducing AFDC benefits merely because the student has on paper received additional income would be unfair and would undermine Congress' desire to encourage the pursuit of a higher education.

DSS contends that, both as a legal matter and in practice, TAP funds are granted to recipients, not to the institutions the students attend. These claims are untenable.

The statute creating the TAP program, N.Y. Education Law § 667 (McKinney Supp. 1979), makes clear that the purpose of the program is to pay a student's tuition, not his living costs. The very name of the program is "tuition assistance." No award can be made unless the student's tuition is at least $200, *id.* § 667(1), and the statute expressly refers to "eligibility for tuition assistance," *id.* § 667(2). The maximum

first claim in several important respects. In *Lumpkin,* appellants had expressly conceded that TAP funds could be used to offset need–a concession that plaintiffs here firmly reject. Moreover, the Court of Appeals in *Lumpkin* assumed "the premise that either BEOG or TAP awards may properly be allocated to actual educational expenses." 45 N.Y.2d at 356, 408 N.Y.S.2d at 423, 380 N.E.2d at 252. That premise, by contrast, is at the center of this litigation. Finally appellees in *Lumpkin* emphasized that the DSS directive was a reasonable policy approved by HEW: "It is also significant that the Commissioner's interpretation of the State Regulations has not been rejected by the Federal authorities responsible for the administration of the AFDC program." Motion to Dismiss Appeal at 8. HEW now vigorously contests that assertion, contending that plaintiffs' suit does not merely present a substantial federal question, but in fact demonstrates that the DSS directive violates federal law. Accordingly, although the *Lumpkin* appeal involved the same regulation as that challenged here, the issues presented in it are not sufficiently similar to dispose of these suits.

14. Plaintiffs in *Hayes* argue that the treatment of SEEK and CD funds also violates the restricted–aid exclusion. The parties have devoted little attention to SEEK and CD funds with respect to this exclusion. Too little information is in the record as to the restricted vel non nature of these grants to justify summary judgment. While the rationale for invalidating 77 ADM–134 in Part IV applies only to TAP funds, however, the alternative grounds in Parts III and V are wholly applicable to all state educational assistance funds, regardless of the nature of the program.

grants are limited by reference to the amount by which tuition exceeds other assistance that "would duplicate the purposes of the tuition assistance award." *Id.* § 667(3)(c), (4)(2)(b). The language of Section 667 is so clear that even defendant DSS concedes that "[t]he TAP award is intended to cover tuition and is not to exceed the amount of tuition." Memorandum of Law in Support of State Defendants' Motion for Summary Judgment at 11. Another New York statute requires that "[a]ll general and academic performance awards shall be used ... for the specific purpose for which the awards are made ...," N.Y. Education Law § 661(6)(a) (McKinney Supp.1979), strongly indicating that TAP grants may only be used to pay tuition.

Here again DSS replies that the New York Court of Appeals decision in *Lumpkin* establishes as a matter of law that TAP grants are awarded to recipients and may be considered in setting the AFDC support level. *Lumpkin* cannot, however, be regarded as having authoritatively resolved this issue. First, the issue was not actually litigated in *Lumpkin*, for plaintiffs there expressly conceded that "to the extent TAP and other non–Federal educational awards exceed necessary and essential expenses

... such excess may properly be considered income and resources for the purpose of determining AFDC allowances." 45 N.Y.2d at 355–56, 408 N.Y.S.2d at 423, 380 N.E.2d at 251. Furthermore, the state court's determination is not controlling in applying the governing federal regulation. As HEW properly argues, however the state construes the TAP award, the objective and language of the federal regulation establishes that for its purposes TAP awards are restricted–purpose educational funds awarded to institutions, not to individual recipients.

Even if TAP funds could be said as a theoretical matter to be available for living costs, the evidence in these cases establishes that in actual operation the TAP program precludes the use of such funds for current living costs. Thus, the New York State Higher Education Services Corporation, the agency responsible for administering the TAP program, has officially stated that "TAP awards are restricted to tuition and as such pay for a student's direct educational cost, with no excess available for any other purpose." Plaintiff Villanueva's Notice of Motion for Summary Judgment, Ex. C.[15] Similarly, Douglas Strauss, the finan-

---

**15.** In a March 1979 letter, Lawrence O'Toole, HESC's counsel, stated as follows with respect to 77 ADM–134:

We have contacted the DSS to protest this policy as one which artificially inflates a student's income with funds which are statutorily prohibited from receipt and use other than payment of tuition.

. . . . .

No TAP award may be used for other living expenses or books or materials associated with college study. Federal funds such as BEOG or work–study funds are designed and intended to provide for such additional expenses, but these are specifically exempted from consideration by DSS .... It is therefore apparent that, because of their inability to attribute as income student aid funds which actually provide for living expenses, DSS is creating the fiction that BEOG is paying tuition and that TAP, a non–exempt award, is available as income. It is a fiction that we cannot support and must actively oppose as an unwarranted and unsupportable construction of the education law.

A student's initial payment of his tuition charge by means of funds other than TAP is

commonplace but should not be construed to mean that TAP is an award for general use. Schools are instructed that in such cases, TAP is to be considered as having paid tuition with the student's prepaid amount paying other fees and expenses.

It is an unacceptable interpretation to say that because a student has prepaid his tuition liability, he has effectively transposed his TAP award into a general use award. It is simply an accounting entry made at a later date by a college. Were the interpretation of DSS to be one accepted by the Corporation, a student's prepayment of his tuition from his student loan proceeds would therefore render his tuition paid and ineligible for a TAP award. Surely, no one is served by such an interpretation based solely on the time at which a student actually pays his tuition charge and essentially "from which pocket."

A subsequent letter by Mr. O'Toole elaborated on the fact that, in practice, TAP funds are unavailable to students for use for current living costs:

As a matter of administrative practice, most institutions in New York now receive lump sum payments reflecting the award eligibility

cial aid coordinator at Bronx Community College of CUNY,[16] and Ellis Cousens, in charge of the TAP program at CUNY, both testified that students very rarely receive funds as a result of the TAP program, and that, in the few instances in which they do, the cash actually represents a rebate of exempt federal funds.[17] Defendant DSS has presented absolutely no evidence to contradict this testimony.[18]

HEW, too, has concluded that DSS policy violates the restricted–aid exclusion. In an October 1979 letter to DSS Commissioner Blum, the HEW Assistant Regional Commissioner for the Office of Family Assistance stated as follows with respect to 77 ADM–134:

> Officials from the New York State Higher Educational [sic] Service Corporation have provided us with full details concerning the nature and purpose of TAP grants. After consideration of this information, we have concluded that the current method of [AFDC] grant calculation in cases involving TAP and BEOG grants is improper.... 45 CFR 233.-20(a)(3)(iv)(b) provides that grants obtained and used under conditions that preclude their use for current living costs shall not be included as income. The singular purpose of the TAP grant is to defray the cost of tuition and fees. The grants are limited in amount to the tuition charged. Although the TAP grant may be paid in a variety of ways (e.g. directly to the school, directly to the student if tuition has been pre–paid), the nature and use of the payment is restricted by the State Education Law. The TAP funds retain this restrictive nature

---

16. Mr. Strauss stated with respect to TAP grants:

> The student never sees the money. The student fills out the application, and when the student is approved, the state sends a lumpsum check. For example, at Bronx [Community College], this semester the lumpsum check was about $3 million, that was for about all 6,000 students who were getting these grants. But the student doesn't get it. It is a transfer payment from Albany to the college, really.

Transcript of Hearing on Preliminary Injunction at 78–79, reprinted in Supplementary Memorandum of Law In Support of Plaintiff Villanueva's Motion for Summary Judgment, App. 1 [hereinafter cited as "Transcript"].

17. Ellis Cousens testified:

> The only method in which a student might possibly receive money from this [TAP grant] is if money was withheld from a BEOG check or a SEOG check or some other check and then when the money is sent down, the actual dollars from HESC are not given to the student. What in fact is given is a refund of that initial federal money that was withheld.
>
> . . . . .
>
> Q: Would you state again what exactly happens to the money that comes from HESC?
> A: It goes into the general college fund for tuition.

Transcript at 161–62.

18. Defendant DSS's sole attempt to contest the restricted nature of TAP grants was the testimony of DSS attorney George Cushing before Judge Duffy. Cushing initially disputed Strauss's testimony, claiming that students received TAP funds individually. *Id.* at 135–38. The following day, however, Cushing reversed himself and conceded that Strauss was correct–TAP funds are sent directly to the college in one lumpsum check. *Id.* at 143–46.

---

of a number of students in attendance at that institution. The award eligibility of each student is then credited against the student account toward satisfaction of tuition liability. In the preponderance of cases the student never receives "cash–in–hand" as a result of his or her TAP eligibility. It is only in cases wherein the student has satisfied his tuition liability from another source, i. e. student loan, parents or their own funds, that a refund is later made to the student. Though the refund is generated by the institution's receipt of the TAP payment, it should be considered to be the refunding of the funds previously deposited by the student and thus attributable to the source from which they were received.

TAP awards are not available to cover any expenses of higher education other than tuition and specified college fees. They are not similar to Basic Educational Opportunity Grants in this regard as BEOG is intended and available for expenses such as books, transportation and general living expenses. Supplemental Memorandum of Law of Defendant Harris, Ex. C. *See also* Memorandum of Marcia E. Podgorsky (HESC Assistant Attorney), March 1979, Plaintiff Villanueva's Answering Affidavit of Gretchen L. Sprague, Ex. A ("TAP payments are made directly to the school, *not* the students .... In no event, are TAP checks mailed from NYSHESC directly to the students at their home addresses.").

regardless of how the grant is actually paid. Therefore, the TAP grant qualifies as a grant obtained and used under conditions that preclude its use for current living costs. No part of a TAP grant may be considered available for use in meeting current living costs.

Aitchison Aff., Ex. A. This interpretation and application of AFDC regulations deserves deference, and it is amply supported by the evidence. 77 ADM–134 contravenes 45 C.F.R. § 233.20(a)(3)(iv)(b) (1979) because it includes in "income" grants "obtained and used under conditions that preclude their use for current living costs."

### V. *Recalculation of Educational Expenses*

DSS and the courts that have upheld 77 ADM–134 and similar policies contend that including excess educational assistance funds in an AFDC recipient's income is necessary to prevent him from receiving a windfall in public assistance. The existence of these excesses, however, does not stem from largess or error on the part of financial aid officers. Rather, the discrepancies between educational assistance and expenses exist because DSS recalculates recipients' educational expenses, using a lower student budget than do the schools' financial aid officers. This recalculation of expenses itself interferes impermissibly with the federal educational assistance scheme.

■ As noted above, the federal educational assistance program is complicated. It comprises several different federal grants and loans, and these are intertwined with numerous state assistance programs. In determining supplemental assistance (*e.g.*, SEOG, NDSL, CWS), financial aid officers must consider all other assistance available to the student, whatever its origin. 45 C.F.R. §§ 174.14(b), 175.14(b), 176.-14(b) (1979). As a result, changes in the level of any single type of assistance will often affect all the other types. Furthermore, the Commissioner of Education is the officer responsible for administering federal assistance programs. It is the Commissioner who by statute must determine the actual cost of attending an institution and prescribe regulations to be used by schools in calculating student need. *See, e.g.*, 20 U.S.C. § 1070a(a)(2)(B)(iv); *id.* § 1070b-1(a)(2)(C); 42 U.S.C. § 2754(a)(3)(A). The Commissioner has, in turn, delegated to participating institutions–subject to his criteria and approval–the task of determining their students' actual cost of attendance. 45 C.F.R. §§ 174.11, 175.11, 176.11 (1979). The schools' determination of expenses must be reasonable, and the Commissioner has imposed stringent obligations upon participating institutions to ensure that no student receives excessive financial assistance. Among other things, for example, the institutions must take into account a student's AFDC funds. *See* 45 C.F.R. § 190.33(a)(2) (1979). This administrative structure, created by federal law, means that the decisions of the individual institutions as to what constitutes reasonable expenses, unless rejected by the Commissioner, have the force of federal law and cannot be effectively overturned by state officials.

■ The DSS directive challenged in this litigation seeks to displace the results reached by operation of the federal scheme. The reason DSS finds that AFDC recipients receive excess educational assistance funds is that DSS uses a different figure for educational expenses than do institutions such as CUNY. Some items included in the institutions' computation of need, such as expenses for room and board and support of the student's dependents, *see* 45 C.F.R. §§ 174.11(a), 175.11(a), 176.11(a) (1979), are absent from DSS's computation, *see* 77 ADM–134 at 2. Other items are included in the DSS computation, but at stringently low levels: for example, $1 per day for transportation and $1 per day for lunch. *See* Transcript at 55 (Testimony of Diana Volker). It is these differences in student expense budgets–not any ineptitude or impropriety on the part of financial aid officials–that results in the purported excesses. Recalculation of these expenses by DSS interferes with the federal educational assistance program, for that program vests the authority to determine such expenses in the Commissioner of Education and derivatively in the institutions, not in state welfare officials.

The reaction of CUNY to DSS's directive—originally challenged in *Hayes*—demonstrates how, as a practical matter, DSS interferes with the federal educational support scheme. When DSS promulgated its new policy, CUNY created a separate expense budget for students receiving AFDC funds. In response to this litigation, CUNY has not implemented that change. But CUNY has indicated that, if 77 ADM–134 is upheld, it will be forced to use "different criteria" for awarding assistance to AFDC recipients than to all other students, for if its grants to AFDC recipients are consistently deemed excessive by DSS, the school will in effect be subsidizing the welfare agency, which will reduce its assistance to these students. If CUNY were to attempt to compensate for any AFDC reduction by increasing assistance, "a downward spiral would be created whereby each attempt to meet the student's needs would result in diminution of his AFDC. Memorandum of Law on Behalf of CUNY Defendants at 10–13. Ultimately, it would be the DSS officials—not the educational officials—who determined a student's financial aid award.

DSS presses two arguments in its defense. The first, that DSS is authorized under state regulations to determine which educational expenses are necessary, deserves little attention. Even assuming that this claim is correct,[19] state law must give way to a contrary federal scheme.

The second argument is that DSS's recalculation of expenses is necessary to prevent financial windfalls to AFDC recipients. The agency describes the discrepancies between its student expense budgets and those of the institutions as "costs which may ultimately be rationalized as part of the educational process but which are, in reality, the costs of conferring a higher standard of living." Answering Memorandum of Law in Behalf of State Defendants at 10. The courts that have upheld 77 ADM–134 have similarly expressed concern that a student may receive duplicative grants and therefore too much money. *See, e. g., Lumpkin v. Department of Social Services, supra,* 45 N.Y.2d at 356–57, 408 N.Y.S.2d at 424, 380 N.E.2d at 252; *Tavarez v. Sipprell,* 62 A.D.2d 631, 638, 405 N.Y.S.2d 531, 535 (4th Dep't 1978); *cf. Richman v. Juras,* 393 F.Supp. 349 (D.Or.1975). In the words of the *Lumpkin* court, "If it be considered that educational funds are being used to subsidize welfare programs, the remedy . . . lies in the monitoring of educational grants to eliminate duplication." 45 N.Y.2d at 357, 408 N.Y.S.2d at 424, 380 N.E.2d at 252.

Monitoring educational grants is, of course, an important and necessary task. To the extent that recipients are receiving more funds in educational support than federal laws and regulations permit, those funds are being wasted and should be spent on individuals with genuine educational need. If excesses are occurring because of computational or administrative errors, however, the duty to eliminate them is imposed upon the Commissioner of Education and individual financial aid officers, not upon state welfare officials.

In referring to excesses, however, DSS does not mean amounts given to students in error; rather, it means amounts intentionally awarded by the Commissioner of Education and participating institutions as necessary to pursue a higher education. These funds do not duplicate welfare grants. They are supplementary funds awarded to all students, including AFDC recipients, because of the judgment of responsible educational officials that all students incur special costs in pursuing an education. That

---

**19.** DDS's claim appears to be erroneous as a matter of state law. 18 N.Y.C.R.R. § 352.-16(d)(1) (1979) does indeed require that grants for "necessary or essential school expenses" not be treated as income. But nowhere does the regulation require DSS to be the agency that determines educational necessity. Prior to the adoption of 77 ADM–134, DSS deferred to the schools' expense determinations. Moreover, New York law provides that supplemental educational assistance "shall be furnished pursuant to criteria promulgated by such universities and approved by the regents and the director of the budget." N.Y. Educ. Law § 6452(4)(a)(v) (McKinney 1972).

judgment cannot be frustrated by state welfare officials. Therefore, the DSS policy of recalculating a student's educational expenses pursuant to its own standards of educational need interferes with the governing statutes and regulations and is invalid.

For the reasons stated above, 77 ADM–134 is declared invalid, and the calculation of AFDC eligibility or benefits pursuant to that directive is prohibited. In replacing that policy, defendants (1) may not take federal educational assistance into account directly or indirectly in determining available income and resources, (2) may not treat TAP funds as available for current living expenses, and (3) must adopt the school expense figures used by the respective institutions in their financial aid calculations, unless modified by responsible federal authority.[20] Summary judgment is therefore granted to plaintiffs in accordance with this declaration. Fed.R.Civ.P. 56(b).

So ordered.

On Motion For Stay Pending Appeal

The New York State defendants[1] in this case have moved to stay pending appeal this Court's judgment for plaintiffs, entered pursuant to an opinion issued on November 7, 1980. Plaintiffs vigorously oppose the motion. The issue is close, and its resolution is made especially difficult by the pau-

city of guidance on the subject. Because the equities with respect to severity and irreparability of harm tip in plaintiffs' favor, the motion for a stay is denied.

The November 7 opinion sets forth the relevant facts. Plaintiffs are university students who receive welfare (and their families). This Court held that plaintiffs are entitled to a level of public support equal to that accorded students who are not on welfare. On December 10, over one month after the Court's decision, defendants moved to stay the judgment pending appeal. The parties have responded capably to the Court's requests for supplemental briefing, but the precedents that they have unearthed are not definitive.[2]

■ A motion to stay is governed by Federal Rule of Civil Procedure 62(c).[3] Issuance of a stay pending appeal is discretionary and equitable, requiring the balancing of four factors: the movant's likelihood of success on appeal; the irreparability of the injury that the movant will suffer if the stay is denied; the harm that the prevailing party will suffer if the stay is granted; and the effect of issuance on the public interest. The movant bears the burden of proof. *See generally* 7 *Moore's Federal Practice* § 62.05 (2d ed. 1978); C. Wright & A. Miller, 11 *Federal Practice & Procedure* § 2904 (1973).

---

**20.** Defendant Patricia Roberts Harris, substituted for Secretary Califano, contends that the action is moot as to HEW because it concurs with plaintiff that 77 ADM–134 is unlawful. Plaintiffs insist, however, that HEW has failed to comply with 42 U.S.C. § 604(a), by continuing to fund the New York AFDC program despite violations of the conditions of participation. At this point, a dismissal of the claim against HEW without prejudice is appropriate, for DSS is likely to comply with a final adjudication of the issues presented.

**1.** The stay has not been sought by all defendants. Defendant City University opposes the stay, and defendant New York City Human Resources Administration takes no position. The movants will be referred to herein generally as "defendants."

**2.** The closest precedent is *Termini v. Califano*, 611 F.2d 367 (2d Cir. 1979), *rev'g* 464 F.Supp. 797 (W.D.N.Y.1979). Plaintiff in that case sued the Secretary of HEW and the New York State

Department of Social Services, contending that a state policy used in determining Supplemental Security Income benefits was unlawful. The District Court ruled that the state policy violated federal regulations, and it ordered defendants to institute a higher level of benefit payments. The District Court entered a twenty-day stay of its order. The Second Circuit refused to grant an additional stay pending appeal, despite pleas by the Department of Social Services similar to those it makes here, and even though the merits were so close that the Court of Appeals in fact ultimately reversed.

**3.** This provision governs the staying of injunctions pending appeal. Although the November 7 order did not expressly grant injunctive relief pursuant to Rule 65, it was nevertheless clearly injunctive in nature. This Court declined to issue an injunction at that time because it presumed that an injunction would be unnecessary.

These standards are well-established and uncontested by the parties. The standards are identical to those used in other contexts, particularly in deciding applications for preliminary relief, but they should be applied somewhat differently in the postjudgment context.

## I. Likelihood of Success on Appeal

In the pretrial context, an inquiry as to the likelihood of success on the merits is often one in which both sides have a genuine opportunity to influence the court; because the judge has yet to decide the merits, each side is free to argue that it is more likely than the other to prevail. In the postjudgment context, the opportunity to influence the court is necessarily more limited; because the judge has ruled, only the side with which he agreed is able to argue persuasively that it is more likely than the other side to succeed on appeal. This difference in contexts suggests that the party seeking a stay pending appeal should be required to show only that its arguments raise a substantial possibility, although less than a likelihood, of success; the greater that possibility, the more justifiable is issuance of a stay. *Cf. Evans v. Buchanan,* 435 F.Supp. 832, 843–44 (D.Del.1977); *Stop H–3 Association v. Volpe,* 353 F.Supp. 14, 16 (D.Haw.1972).

How is the trial judge to assess the possibility that he has erred? Although a judge who has not finally ruled might be capable of conceding that his tentative conclusion is questionable, a judge who has reached a final conclusion will inevitably lose some of the capacity for detachment that he might normally possess. To counteract this tendency, the judge should turn to external, preferably objective, indicia of the accuracy of his judgment. Prominent among these would be the extent to which the challenged decision is supported by precedent; the standard of review that will govern the appeal; and the extent to which the decision is supported or opposed by government agencies to whose judgment the appellate court would normally defer.

Applying these factors to the present motion, the State appears to have a substantial possibility of success on appeal. The November 7 decision is not one dictated by governing precedent. Few cases have dealt with the issues raised by this suit, and the closest precedent—a New York Court of Appeals decision—upheld the challenged policy in a decision that this Court was forced to distinguish. Absent definitive appellate guidance, a court—no matter how confident that its decision is correct—must recognize that it is operating in an area or uncertainty. Furthermore, the Second Circuit will review the challenged decision without any of the deference accorded factfinding functions. The November 7 decision rests almost entirely on the interpretation of statutes and regulations; the only factual controversy involved did not prevent the Court from granting summary judgment.

Although a substantial likelihood exists that the challenged decision will be reversed, that likelihood is lessened by the fact that federal and state agencies with special competence in social welfare and education agree with the Court's position. The Department of Social Services ("DSS"), charged with administering the state welfare scheme, insists that its regulation is lawful. But other state agencies with authority over the educational funding system, including the Higher Education Services Corporation and City University, believe that the contested policy violates various federal laws. They are joined in that position by the former Department of Health, Education and Welfare (presently Health and Human Services)—an agency entitled to considerable deference on the issue, not merely because it is a federal body, but also because it is responsible for administering both the welfare and educational funding systems.

## II. Irreparable Injury

 A party seeking a stay pending trial must show that it will be injured irreparably if the stay is denied. The Second Circuit's recent formulation of this standard

makes a showing of irreparable injury a prerequisite to relief under both of the alternative tests for preliminary relief. *KMW International v. Chase Manhattan Bank, N. A.*, 606 F.2d 10, 14 (2d Cir. 1979).

This requirement should be applied more stringently after trial, on motions for stays pending appeal. Courts seek to avoid irreparable injury prior to trial, not because an irreparable injury is necessarily unjust, but because the legality of its imposition has yet to be determined. After judgment is entered, the propriety of the injury—however irreparable—has been judicially determined, and its imposition without further delay is surely more acceptable than prior to judgment. What follows from this greater acceptability for permitting irreparable injury is a corresponding increase in the burden of justifying its continued deferral. On the other hand, the right to appeal implies an interest in preventing irreparable injury that later might be determined was improper; at minimum, the right to an appeal suggests suspension of any possible injury that would render the appeal meaningless. But in general, the losing side in a litigation should bear a heavier burden on this issue, when the injury alleged is not of the sort that would interfere with the appellate function.

DSS alleges that two types of irreparable injury will occur if a stay is denied: creation of administrative burdens, and the payment of millions of dollars of unrecoverable welfare benefits. With respect to the former injury, DSS argues that in order to implement the judgment, it will have to redraft forms, retrain officials, and review the grants of affected recipients. "The recent flurry of court mandated programs and policy changes are taxing the limited resources of the local social services districts to the point where any additional burdens at this time could seriously jeopardize the administration of programs of public assistance...." Affidavit of Seymour Katz (Director, Income Support Unit, Division of Income Maintenance, Department of Social Services), December 8, 1980, ¶ 4. The burdens created by the November 7 judgment cannot, however, be so readily equated with the effects of judgment in other cases. The order under challenge requires defendants to stop considering a few clearly specified items of educational assistance as available income. The change is prospective; defendants will have to recompute awards only as of November 7, 1980. The welfare determination process remains essentially unaltered. In fact, the judgment would ultimately reduce administrative burdens: welfare officials would no longer need to recompute benefits whenever an individual received educational assistance. Furthermore, the new standards are familiar to DSS; they are in essence the same as those followed by DSS before it adopted the unlawful directive of 1977. In a very real sense, therefore, any injury suffered by DSS in this case stems from its own decision to change established procedures. Finally, irreparable injury at least as great as defendants seek to avoid by a stay would be inflicted upon DSS if a stay were granted and the judgment affirmed: defendants would then have to undertake not only the changes ordered on November 7, but would also have to undo the additional determinations made in the interim.

Defendants also claim that denial of the stay could result in the loss of millions of dollars. A 1979 projection estimates that exclusion of the educational grants involved in the judgment would require additional annual expenditures of $8.5 million. Katz Affidavit ¶ 3. This $8.5 million estimate applies only if an entire year elapses between issuance and reversal of the judgment; defendants could shorten that period by seeking an expedited appeal. Moreover, although the parties are unclear as to the exact percentage, a substantial portion (about 50%) of this estimated amount would ultimately be borne by the federal government, which agrees that the state policy is unlawful and seeks no stay. An additional amount (about 25%) will be borne by New York City for all recipients on its welfare rolls, thus reducing further the expense that would be sustained by DSS. The amount that might actually have to be borne by the State will be much less than

the estimated $8.5 million and will constitute an extremely small portion of DSS's overall income maintenance budget, which amounts to approximately $900 million.

The extent of DSS's irreparable injury would not, in any event, amount to the total funds expended pursuant to this Court's order. If the November 7 decision were reversed, DSS would be free to recoup funds that it was improperly forced to pay, and it has announced its intention to do so. Letter of Robert A. Forte, January 8, 1981. But DSS contends that recoupment would be difficult because some recipients would "complete their education and leave the welfare rolls," and "actual use of the money and subsequent claims of undue hardship" would frustrate recoupment. Letter of Robert A. Forte, December 29, 1980. DSS conceded at oral argument, however, that recoupment is feasible in all cases in which the recipient continues to receive welfare. If the appeal is disposed of promptly, only a small portion of the money paid out would pose severe recoupment problems. Moreover, the State could take special steps to increase the likelihood that it would be able to recoup payments from persons who graduate, get jobs, and therefore leave the welfare rolls; for example, DSS could require that such students sign conditional notes for the disputed money and file their current addresses with their colleges. Hardship claims would have to be dealt with individually and would no doubt force DSS to expend some administrative resources and to forego collection in some cases. But DSS has failed to establish the extent of those expenditures. Even if all ambiguities are resolved in the State's favor, the prospective loss in State funds—though not insignificant—is but a fraction of the State's estimate.

### III. Balancing of Equities

The State defendants have shown that an appeal in this case would have a substantial possibility of success and that denial of a stay could cause some degree of irreparable injury. Consideration of the possible injury to plaintiffs if a stay is granted is therefore necessary.

The evidence submitted on this motion, and at prior stages in this litigation, establishes that staying the judgment pending appeal would severely and irreparably harm thousands of persons in plaintiffs' putative class.[4] The students whose benefits are reduced pursuant to defendants' policy are on the economic margin: a reduction in welfare benefits will be felt immediately, and these students by definition do not have a nest-egg upon which they can subsist pending appellate litigation. Plaintiffs have presented evidence, collected by defendant City University, which indicates that the average welfare reduction among the surveyed members of plaintiffs' putative class amounted to $100 per month. The data show that one-fourth of the students whose benefits had been reduced were forced to suspend their education for one or more semesters. Affidavit of Gretchen L. Sprague, December 19, 1980, Ex. 1, 2. These findings, which defendants have not contested, are methodologically flawed, but they can be relied upon to support what common sense would in any event indicate: welfare students who lose $100 per month in assistance will be under severe pressure to drop out of school. The educational institutions cannot correct this shortfall, for any increase that they attempt to make in a welfare student's budget would lead to a corresponding decrease in the student's welfare funds. Moreover, budgetary constraints prevent City University from increasing a student's aid package during the academic year. Affidavit of Lydia Amy, December 19, 1980. As the Vice Chancellor of City University concluded: "the survey's bottom-line finding is this: at least one quarter of all welfare students who are cut by the DSS will be forced to withdraw from college." *Id.* Ex. 2.

4. Although the Court conditionally denied class certification after judgment, it did so because of defendants' assurance that, if upheld, the judgment would apply to all members of the putative class, not merely to the named plaintiffs. Accordingly, the impact must be measured in terms of thousands of welfare-students and their families throughout New York State.

Students who continue their studies will also be affected. The welfare students in this litigation are being deprived of about $100 per month that educational authorities have concluded they need as fulltime students. This deprivation seems certain in many cases to affect adversely the ability of students to compete and to achieve their full potential. Among the students with whom they compete are those, not on welfare, who receive the full support intended by federal grants.

The financial hardship and competitive disadvantages that these students would suffer pending appeal—and that some have suffered since 1977—cannot be undone by a retroactive grant in the future. For students forced to leave school temporarily, the educational hiatus is lost forever. Some students forced to drop-out may give up and never complete their education. Students who fail to achieve their full potential in a given semester may not be able thereafter to repeat their courses.

Defendants' position is cavalier: "plaintiffs will suffer no hardship ... [by being] deprived of a privileged status." Katz Affidavit ¶5. The issue is not whether the students will subsist, but whether they will be injured as students. Even assuming that DSS will prevail on the merits in this litigation, plaintiffs are certain to suffer substantial hardship as students, both in absolute terms and relative to nonwelfare students.

Finally, defendants' reliance upon the denial of a preliminary injunction in July 1978, as establishing the absence of irreparable harm, is meritless. That decision, *Hayes v. City University*, 454 F.Supp. 1118, 1123 (S.D.N.Y.1978), was made in the early stages of this litigation, on the basis of an incomplete record as to injury. The burden of proof in seeking the preliminary injunction was upon plaintiffs. At this stage, just as there is now an acceptable judicial predicate for imposing irreparable injury on the losing parties, the imposition of such injury on the prevailing parties becomes more difficult to justify, their rights having been established. Most significantly, that ruling

was made at a time when defendants still used City University's student need figures; defendants subsequently rejected those standards in favor of their own, lower figures.

The final relevant factor referred to in decisions on stays pending appeal is "the public interest." The public has a substantial interest in avoiding needless expenditures of fiscal resources. Yet the public also has a vital interest in ensuring that impoverished students be given a full opportunity to better their condition and become self-sustaining—in defendants' words, "to complete their education and leave the welfare rolls." Given the importance of both these considerations, and the necessarily subjective judgment that choosing between them would entail, this case should turn upon the more concrete factors discussed above.

■ This decision is a close one because DSS may well succeed on appeal and will suffer some injury by denial of a stay. On the other hand, the likelihood of DSS's succeeding is lessened by the fact that the federal government and all the relevant educational agencies agree with this Court's position. Furthermore, the prospective injury to DSS is relatively slight in the post-judgment context and is not the sort of injury that would interfere to any extent with the appellate function in this case. Finally, injury to plaintiffs' putative class would be substantial, irreparable, and especially difficult to justify after judgment. On balance, therefore, the motion for a stay must be denied. Defendants are ordered forthwith to cease recomputing students' benefits pursuant to the directive declared unlawful by the opinion of November 7, 1980. All other terms of that judgment will take full effect within ten (10) days of this order. Defendants may seek appellate relief in the interim.

So ordered.