**In re FAMILY SHOWTIME THEATRES, INC., Cordamanda Development Corp., Family Showtime Theatres of Levittown, Inc., Family Showtime Theatres of Bay Parkway, Inc., Debtors.**

Bankruptcy Nos. 085–50528–21 to 085–50531–21.

United States Bankruptcy Court, E.D. New York.

Oct. 9, 1986.

On Motion for Stay Nov. 25, 1986.

Finkel, Goldstein & Berzow, by Harold S. Berzow, New York City, for debtors.

Shea & Gould, Daniel L. Carroll, and Michael E. Emrich, of counsel, New York City, for Toys R Us.

Curtis, Mallet-Prevost, Colt & Mosle by Lynn P. Harrison III, New York City, for Pizza Time, Inc.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

The Court's previous opinion in this matter, *In re Family Showtime Theatres, Inc.*, 58 B.R. 679 (Bankr.E.D.N.Y.1986) ("Family Showtime I"), left for resolution the issue of whether the debtor had proceeded with due diligence to cure its default under its lease after receiving its landlord's Notice of Default. If it did not, its lease terminated pre-petition upon transmittal by its landlord of a Notice of Termination. The issue as to the status of the lease at the time the debtor filed is before the Court as the result of a motion by Family Showtime Theatres of Bay Parkway, Inc. ("Family Showtime Bay Parkway"), pursuant to 11 U.S.C. § 365(d)(4), to extend its time either to assume or to reject its lease ("the Lease") with Toys "R" Us-Nytex, Inc. ("Toys R Us"). Toys R Us has opposed the motion on the ground that the Lease no longer existed at the time that Family Showtime Bay Parkway petitioned for Chapter 11 relief. Because the Court agrees, the debtor's motion must, accordingly, be denied.

## I

## BACKGROUND

The history of this case is set down in Family Showtime I, and will not be repeated. In brief, Family Showtime Bay Parkway, (along with Cordamanda Development Corp. and Family Showtime Theatres of Levittown, Inc.), is one of three subsidiary corporations of Family Showtime Theatres, Inc., ("Family Showtime Theatres"), a publicly held corporation, all of whom have followed their parent into Chapter 11.[1] Each one of the subsidiaries either currently operates, or once operated, a family restaurant under the name "Chuck E. Cheese." The instant matter stems from a request by all four corporations for permission to borrow $300,000.00 from the Chemical Bank to cure certain alleged defaults in Family Showtime Bay Parkway's lease with Toys R Us and in Family Showtime Levittown's lease with its landlord, J.W. Mays, Inc.

The application was opposed by Toys R Us, which applied for an order to require the immediate surrender of the leased premises. Its position was that the Lease had been validly terminated pre-petition pursuant to its terms.

The following facts, set forth in the Court's earlier opinion, can now be deemed established:

Family Showtime Bay Parkway, under the terms of its ten year lease commencing May 1, 1983, with Toys R Us, is required to build two outside elevators to its restaurant-amusement arcade on the building's second floor. The Lease between the parties gives the landlord, Toys R Us, certain rights in the event of a default by the tenant, Family Showtime Bay Parkway, in performance.

Section 26 of the Lease provides that:
A. The following shall be defined and deemed as an 'Event of Default: ....(d) any failure of Tenant to perform any other of the terms, conditions, or covenants of this Lease to be observed or performed by Tenant for more than thirty (30) days after written notice of such default shall have been served upon Tenant (or, in the even such default cannot be cured within thirty (30) days, then, if Tenant does not commence within said thirty (30) day period to attempt to cure said default and thereafter proceed with due diligence in curing the same.

\* \* \* \* \* \*

B. Upon the occurrence of any Event of Default, Landlord shall have the option to pursue any one or more of the follow-

1. By order of this Court dated January 16, 1986, all four matters have been procedurally consolidated.

ing remedies without any notice or demand whatsoever:

(i) Terminate this Lease, in which event Landlord shall so notify Tenant and Tenant shall immediately surrender the Demised Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which it may have, enter upon and take possession of the Premises and expel or remove Tenant and any other person claiming under or through Tenant who may be occupying the Premises or any part therein.

Pursuant to this provision, Toys R Us sent, on January 15, 1985, a notice by certified mail to Family Showtime Bay Parkway ("Notice of Default") stating that failure to complete installation of the elevators, within 30 days of the receipt of the letter, would result in an "Event of Default," as defined in Section 26. The elevators were not completed within the stipulated 30 day period. On February 26, 1985, a second letter was sent headed "Notice of Termination of [Lease]." Referring to the default specified in the earlier letter, Toys R Us advised Family Showtime Bay Parkway that it was electing to terminate the Lease pursuant to Section 26(B)(i).

In March, 1985, based on these facts, Toys R Us commenced a summary eviction proceeding in the Civil Court of the City of New York, Kings County. This proceeding was repeatedly adjourned until it was brought to a halt by the filing of a petition under Chapter 11 in this court by Family Showtime Bay Parkway on August 15, 1985.

In Family Showtime I, this Court held that these facts alone did not permit it to rule on Toys R Us' contention that the Lease had been terminated pre-petition:

It is the position of Toys R Us that Section 26–B of the Lease created a conditional limitation and that upon transmittal of a notice of termination, as authorized by that section, the term of that lease came to an end.

The Court agrees that this could be the effect of a Section 26–B notice provided that a default existed giving rise to the right to transmit such notice. On the crucial facts, the record before this Court is inadequate.

Section 26–A sets up two categories of defaults: those susceptible of cure within 30 days and those not so susceptible. It is only with respect to the former that the lapse of 30 days without cure gives the Lessor the right to send a notice of termination. As to the latter category, a notice of termination can be sent *only if the Tenant does not attempt within said 30 day period to cure the default and thereafter proceed with due diligence.*

There is no evidence that the elevator default was capable of cure within 30 days. Indeed, what little is known indicates the contrary. If it were not so susceptible, then the mere lapse of 30 days without cure did not give Toys R Us the option to terminate. *That option would have existed only if Family Showtime Bay Parkway, subsequent to receiving the letter of January 25, 1985, failed to commence to attempt to cure said default and failed to proceed thereafter with due diligence.* The record throws little, or no, light on what Family Showtime Bay Parkway did after receiving the letter. To determine whether Toys R Us had the option it purported to exercise to terminate the Lease would require a trial of the facts, which has not so far been had.

The strict construction this Court is placing on Section 26 is consistent with the principle that the Lease is to be construed against its draftsman to avoid the gross hardship of forfeiture of a lease. *Jones v. Gianferante,* 305 N.Y. 135, 138, 111 N.E.2d 419 (1953).

*Family Showtime I,* 58 B.R. 679, 683 (Bankr.E.D.N.Y.1986) (emphasis added).

The parties have elected to litigate the matter of default before this Court, rather than in the Civil Court of Kings County, giving rise to a core proceeding. 28 U.S.C. § 157(b)(2)(D), (G), (O). This resulted in a three-day trial, during which each side

presented evidence and put forward witnesses, all addressing the question of exactly what Family Showtime Bay Parkway either did or failed to do in regard to the elevators, particularly during the crucial 30 day period following January 15, 1985.

## II

## FINDINGS OF FACT

1. The second floor premises which Family Showtime Bay Parkway leased from Toys R Us beginning May, 1983 for a term of ten years, required extensive renovation and remodeling to be suitable for use as a restaurant and amusement arcade, the business of Family Showtime Bay Parkway. Under its lease, Family Showtime Bay Parkway undertook to do all the necessary work.

2. Section 10(B) of the Lease provides: Tenant [Family Showtime Bay Parkway], shall, at its own expense, based upon detailed plans and specifications to be furnished to and approved by Landlord [Toys R Us] . . . make any repairs and/or alterations to the Demised Premises as shall be required in order to open said Demised Premises to the public . . .

3. Pursuant to the plans submitted by Family Showtime Bay Parkway, it was obligated to construct two elevators with accompanying shaftways. Upon completion of these elevators, it was to receive a credit equal to half the expense of construction, up to a maximum amount of $100,000.00, as a set-off against its rent.

4. On July 27, 1983, Family Showtime Bay Parkway entered into a contract with Dover Elevator Company ("Dover") for the purchase and installation of two passenger elevators for an agreed upon price of $205,-000.00, plus an additional $13,000.00 to expedite a completion date of January 16, 1984. Completion by that date was made contingent upon installation by Family Showtime Bay Parkway of a "legal hoistway, permanent power, and all support for elevator equipment" by December 12, 1983. (Debtor's Exhibit 2)

5. Dover, after starting work under its contract, withdrew its work force from the job site in February, 1984 for two reasons: (1) the New York City Department of Buildings ("Building Department") refused to issue a building permit for the elevators because the hoistways, which were being constructed by the general contractor retained by Family Showtime Bay Parkway, were structurally unsound (Toys R Us Exhibit E); and (2) Dover was not being paid for its work by Family Showtime Bay Parkway; it had received only $16,500.00 and was owed an additional $65,000.00. (Tr. 6/17/86, p. 70, Testimony of Roland Marr)

6. At the time Dover stopped work, the major portion of the work on the elevators still had to be done, including the installation of the piston arrangement on one elevator, completion of the guide rails, the car framework, the entrance enclosures, the car enclosures, and the adjusters. (Tr. 6/17/86, pp. 69–70, Testimony of R. Marr)

7. The problem with the hoistways for the elevators, which were exterior to the existing building, was that they had moved away from the building, leaving a gap between the building wall and the hoistway walls. Family Showtime Bay Parkway unsuccessfully tried to repair these hoistways, first by pinning the new walls to the existing structure, and then by undertaking a "mudjacking" procedure to stabilize the subsoil beneath the ground. (Debtor's Exhibit 3)

8. In February or March, 1984, Family Showtime Bay Parkway opened for business in the remodeled premises, leaving the elevators unfinished.

9. The elevator situation remained in limbo for several months. Relations between Toys R Us and Family Showtime Bay Parkway were in the meantime growing increasingly testy, as disputes arose in relation to refuse collection on the premises and other matters not relevant to the instant litigation.

10. On August 20, 1984, Dover filed a mechanic's lien against the premises for $64,484.00. Under the terms of the Lease, Family Showtime Bay Parkway was

obliged to keep the premises free of any liens arising from its improvements. On September 14, 1984, Toys R Us sent Family Showtime Bay Parkway a Notice of Default based on the filing of the lien. Family Showtime Bay Parkway arranged within 30 days to remove the lien by having it bonded. Chemical Bank, with which Family Showtime Bay Parkway enjoyed a $2 million line of credit, gave a letter of credit in the amount of $65,000.00 to the bonding company.

11. This incident may have specifically piqued Toys R Us' interest in the elevator problem, or it might have begun pressing the debtor on this matter anyway. At any rate, from September, 1984 onward, the question of how and when the elevators would be completed appears to have been the primary matter of dispute between the two parties.

12. At a meeting on October 10, 1984, between representatives of Family Showtime Bay Parkway and representatives of Toys R Us, held in the offices of Toys R Us, Richard Berland, Chairman of the Board and Chief Executive Officer of Family Showtime Theatres, proposed that Family Showtime Bay Parkway install only one elevator rather than two. Toys R Us agreed, provided acceptable architectural plans could be drawn eliminating the second elevator. At the same meeting, Berland requested that Family Showtime Bay Parkway be permitted to use the rent credit during the course of construction rather than receiving it after completion of the elevators. This proposal was "categorically" rejected by Michael Miller, Senior Vice President for Real Estate of Toys R Us, who was in charge of its overall real estate program. (Tr. 6/19/86, p. 5, Testimony of Michael Miller)

13. During the same month, October, 1984, Berland, on a visit to Dover's warehouse in New Jersey, was advised that because the two elevators cabs had already been manufactured, there would be no significant saving in building one elevator rather than two.

14. This information, however, was not immediately transmitted to Toys R Us. In the belief that Family Showtime Bay Parkway was still contemplating the installation of a single elevator, Jeffrey Finkel, Director of Real Estate Projects at Toys R Us, wrote the President of Family Showtime Theatres, Leon J. Blumenthal, pressing for a completion date for the promised elevator.

15. On November 20, 1984, Finkel wrote Blumenthal requesting the revised architectural plans and a timetable for the installation of the elevator. (Toys R Us Exhibit D) On December 11, 1984, Finkel wrote Blumenthal again stating that the failure to provide Toys R Us with the elevator shaft architectural plan and to complete the promised elevator "shows a sign of bad faith on your part in fulfilling your obligations as agreed to at the October 10th meeting." (Toys R Us Exhibit B)

16. So prodded, Blumenthal first advised Finkel that the one elevator concept had been abandoned because it would represent no savings. His letter continued: "We are still trying to work out an acceptable arrangement with Dover Elevator for the swift completion of these elevators. To this date, the situation has not been resolved and I am sorry that I cannot give you a definite timetable for completion of the project." (Toys R Us Exhibit F)

17. There is no evidence of any communication between Family Showtime Bay Parkway and Dover during this period.

18. When Toys R Us received Blumenthal's letter of December 18, 1984, it decided to refer the matter to counsel for legal action. Thereafter, on January 15, 1985, a Notice of Default was sent, followed by a Notice of Termination on February 26, 1985.

19. The elevators were not susceptible of construction within 30 days, and the default represented by the failure to complete them could not be cured within 30 days of the receipt of Family Showtime Bay Parkway of the Notice of Default.

20. Berland testified that sometime subsequent to receiving the Notice of Default, he had several conversations with Miller of Toys R Us and with Marr of Dover, with an eye towards putting together a package that would permit Family Showtime Bay Parkway to complete the elevators as follows: Dover would be paid $100,000.00 to resume work, made up of the $16,500.00 already received, the $65,000.00 tied up in Chemical Bank's letter of credit, with whatever balance was needed to bring the sum up to $100,000.00 to be supplied by Family Showtime Bay Parkway. The rest of the contract price was to be paid from the rent credit, which Family Showtime Bay Parkway proposed it be allowed to draw while the work was in progress rather than after it was completed.

21. To finance the completion of the elevators in this way would have required the agreement of both Toys R Us and Dover, neither of which ever gave its agreement.

22. Mr. Miller of Toys R Us denied that any request had ever been made of him to use the rent credit to finance the completion of the elevators except at the meeting on October 10, 1984, at which time he had categorically rejected the proposal. (Tr. 6/19/86, p. 13) His subordinate, Finkel, denied receiving any calls from anyone in Family Showtime Bay Parkway after the Notice of Default was sent out. (Tr. 6/17/86, p. 126, Testimony of Jeffrey Finkel) The Court believes these denials.

23. Marr, of Dover, while corroborating that he had had a conversation with Berland somewhat along the lines claimed by Berland, denied that any agreement had been reached. He described the conversation as inconclusive and without result. (Tr., 6/17/86, pp. 74–76, testimony of R. Marr)

"QUESTION: Did you have any phone conversations with Mr. Berland subsequent to this meeting at your office in October of '84?

\*     \*     \*     \*     \*     \*

ANSWER: [I]n February of '85 I assume that we had a phone conversation. I jotted down some figures for my own benefit.

\*     \*     \*     \*     \*     \*

QUESTION: Do you recall what he said?

ANSWER: That was when he, if I recall, when he came up with the idea that he thought that he had a scheme worked out whereby we could get the job moving again with a combination of payment from what he had coming from the Chemical Bank and something about working out something with Toys R Us for rental receipts.

I didn't know what the details were. So I advised him, and I think this conversation took place more than once. In each situation I advised him that if he has an idea, that he gets the job rolling and solves this situation, then by all means have his counsel call Mr. Wolosky, our counsel, and reduce it to writing so we can talk about it.

QUESTION: Did you give him any of his understanding that any of his ideas were acceptable or agreeable?

ANSWER: I was in no position to make any agreements.

24. Family Showtime Bay Parkway did not need to put together a package requiring acceptance of Dover and Toys R Us to proceed with the construction of the elevators. In January, 1985, Family Showtime Bay Parkway had not exhausted its two-million dollar line-of-credit with Chemical Bank and had available to it far more than the $200,000.00, which it then believed was all that was needed to complete the elevators.

25. The reason Family Showtime Bay Parkway now gives for not borrowing the money to complete the elevators from Chemical Bank is that it did not wish to incur the interest charges that would result. However, in February, 1985, Family Showtime Bay Parkway did borrow $200,000.00 from Chemical Bank for other purposes.

26. In March, 1985, Family Showtime Bay Parkway turned to the state courts for

relief and brought the summary eviction proceeding alluded to earlier.

27. On April 10, 1985, as evidenced in a letter written April 11, 1985, the return date on the petition was extended by reason of the promise of Family Showtime Bay Parkway to provide Toys R Us with a schedule by April 16, 1985, for the installation of the elevators. (Debtor's Exhibit 6)

28. On April 17th, a second extension was given on the representation of Berland that he would provide Toys R Us, no later than the end of business on Friday, April 19th, with a time schedule for the installation of the elevators. This letter contained an express reservation of the landlord rights. (Debtor's Exhibit 7)

29. On April 24th, Toys R Us agreed to an extension to May 16th, 1985, provided that it receive (a) a letter from Dover certifying that Dover had been paid $65,000.00, and that Dover was going to perform the elevator installation, plus (b) a schedule indicating the commencement date and completion date, with completion to be no later than July 22nd. (Debtor's Exhibit 8)

30. On April 19th, Berland assured Toys R Us that Dover would be paid $65,-000.00 during the first week of May and would begin construction within two weeks and would complete it within two months.

31. There is no evidence that Dover was ever paid $65,000.00.

32. Berland was unable to secure a schedule from Dover, which was unwilling to commit itself to a completion date until it knew when a building permit would issue.

33. In May, 1985, some four months after Family Showtime Bay Parkway had received the Notice of Default, and more than a year after the Building Department had refused to issue a permit, Berland, after communicating with the Building Department and learning that an engineer's certificate would be required to secure the necessary permit, retained an engineering firm, Maldonado and Associates, Inc. ("Maldonado"), to secure the needed permit. (Debtor's Exhibit 9)

34. From Maldonado, Family Showtime Bay Parkway learned that major work would be required to correct the problem with the hoistways. On June 5, 1985, July 8, 1985 and on September 9, 1985, Family Showtime Bay Parkway entered into written contracts with Maldonado, the last of which called for an expenditure of $46,-200.00 to repair the hoistways so as to allow installation of elevators within them. Since no representative of Maldonado was called as a witness, what work, if any, Maldonado performed pursuant to these contracts is unknown.

STIPULATION

35. On June 21, 1985, Family Showtime Bay Parkway stipulated with Toys R Us to complete installation of the elevators by October 14, 1985. It was agreed that if Family Showtime Bay Parkway failed to finish the work by that date, the summary eviction proceeding would be tried on October 15, 1985, and that Family Showtime Bay Parkway would not seek any further adjournments. The stipulation was signed on August 8, 1985.

36. One week later, on August 15, 1985, Family Showtime Bay Parkway petitioned for relief under the bankruptcy laws.

37. Subsequent to receipt of the Notice of Default by Family Showtime Bay Parkway, nothing was done physically to further the construction of the promised elevators.

38. The status of the construction work today is the same as it was when Family Showtime Bay Parkway received the Notice of Default.

39. Family Showtime Bay Parkway did not attempt within 30 days of the receipt of the Notice of Default, predicated on its failure to finish the elevators, to cure the default.

40. Family Showtime Bay Parkway did not proceed with due diligence to cure the default that was the subject of the Notice of Default.

41. The Notice of Termination sent to Family Showtime Bay Parkway by Toys R

Us in February 26, 1985 terminated the lease of Family Showtime Bay Parkway.

42. Toys R Us did not intend to waive, and did not waive, its right to treat the Lease as terminated by its acceptance of the rent reserved under the Lease, pending the hearing of its summary eviction proceeding delayed because of the adjournments requested by Family Showtime Bay Parkway.

## DISCUSSION

The issue left open by this Court's previous opinion is a very narrow factual inquiry: Did Family Showtime Bay Parkway, after it received a Notice of Default on January 15, 1985, attempt to cure the default which was the subject matter of the notice and did it thereafter proceed with such cure with due diligence.

It is undisputed that to this day nothing has been done on the job subsequent to receipt of the Notice of Default. When work ceased on the elevators in February, 1984, it did so for two reasons: (a) Dover was not being paid and (b) the necessary building permit was not forthcoming because the hoistways were defective. Following receipt of the Notice of Default in January, 1985, nothing was done to cure either problem. No work was done on the hoistways. Until May, 1985, no effort was even made to determine what needed to be done. Equally, nothing was done to put Dover back on the job, although Family Showtime Bay Parkway had available to it the moneys it needed for that purpose. The only activity claimed by Family Showtime Bay Parkway following receipt of the Notice of Default are some inconclusive conversations with Toys R Us and Dover. Otherwise, Family Showtime Bay Parkway admittedly took no action following receipt of the Notice of Default.

■ On this record, the only possible finding is that Family Showtime Bay Parkway neither attempted within the 30 day period to cure the default, nor did it thereafter proceed with due diligence to do so.

Under the plain and unambiguous terms of Section 26 of the Lease, during this 30 day period, Family Showtime Bay Parkway had to take some *tangible, visible* steps towards the completion of the elevators. The Lease required that Family Showtime Bay Parkway proceed with "due diligence." This means "such a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances." Black's Law Dictionary (4th ed. 1951).

Under New York law, no extraordinary effort was required. In *A.D.W. Realty Corp. v. Dee-Dee Cafe Corp.*, 54 Misc.2d 130, 281 N.Y.S.2d 880 (Civ.Co.C.N.Y.1967), merely enlisting, within the five days the lease permitted in which to cure a default, the services of a qualified contractor, who thereafter performed the needed repairs, was held to constitute satisfactory performance. "[T]he activity taken comports with the requirements of the lease ... that the tenant *exercise* [ ] *due diligence* in attempting to cure the alleged default ..." *A.D.W. Realty Corp.*, 281 N.Y.S.2d at 882 (emphasis added).

By contrast, Family Showtime Bay Parkway did nothing concrete within the 30 day period to make the elevators a functioning realty. Berland's efforts, if they were made to secure the consent of Dover and Toys R Us to terms less favorable than each was entitled to under its contract with Family Showtime Bay Parkway, aggravated, rather than ameliorated, the existing default. Family Showtime Bay Parkway was seeking, in effect, to have Toys R Us finance the completion of the elevator rather than use the money available to it on its own line of credit.

The Court, in reaching its conclusions, has not disregarded either its role as a court of equity, or the traditional reluctance of New York state courts to permit the forfeiture of a lease. *See, J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc.*, 42 N.Y.2d 392, 398, 397 N.Y.S.2d 958, 961, 366 N.E.2d 1313, 1316 (1977). The Court also recognizes that the investment represented

by the improvements made by the debtor in the premises in the expectation of a ten year tenure will now be forfeited, and the Court acknowledges the serious, perhaps mortal, blow to the ability of Family Showtime Bay Parkway to formulate a successful plan of reorganization, represented by the loss of a leasehold interest constituting one of its principal assets. Nonetheless, the Court concludes that the debtor has failed to meet the burden spelled out in *Family Showtime I* to show that it took steps, within the 30 day period following the Notice of Default, to complete the elevators and that it thereafter proceeded towards that goal with due diligence.

■ The law's traditional abhorrence of the forfeiture of a lease (*57 E. 54 Realty Corp. v. Gay Nineties Rlty. Corp.*, 71 Misc.2d 353, 335 N.Y.S.2d 872, 873 (1st Dept.1972)) could not and does not constitute an absolute bar to the assertion by a landlord of a valid contract right. "[I]n commercial fairness the parties, especially if represented by counsel, should be held to their bargain, if plainly expressed." *J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc.*, 42 N.Y.2d 392, 406–07, 397 N.Y.S.2d 958, 967, 366 N.E.2d 1313, 1322 (1977) (Breital, C.J., dissenting). Both law and equity may indeed abhor forfeiture, but neither requires or even permits an adjudicating court to re-draft a contract, particularly one that resulted from an arms length transaction.

"*Stability of contract must not be undermined by judicial sympathy ...*" Should we hold that the termination of this lease is harsh and inequitable, then the same conclusion can be reached in every instance where a landlord exercises his contractual rights, and in that event, the right of termination or any other right specified in a lease would be rendered meaningless and ineffectual. *First National Stores, Inc. v. Yellowstone Shopping Center, Inc.*, 21 N.Y.2d 630, 638, 290 N.Y.S.2d 721, 725–26 [237 N.E.2d 868, 870–71] (1968) (emphasis in original) (citations omitted).

Family Showtime Bay Parkway now contends that the failure to complete the elevators does not constitute a material breach of the Lease sufficient to warrant forfeiture. That argument is precluded by this Court's holding in *Family Showtime I* that the debtor's failure to install the system would, if in fact proven at trial, constitute such a material default. Rental under the Lease was dependent on gross profits, and as Berland himself admitted, installation of the elevators would have "increase[d] business dramatically." [2]

■ The Court finally considers Family Showtime Bay Parkway's contention that Toys R Us waived its right to terminate the Lease by accepting rent subsequent to the Notice of Termination. This is a new issue. Waiver is a matter of intent which depends on the factual circumstances of each particular case. *In re Delta Hotel of Syracuse, Inc.*, 10 B.R. 585, 597 (Bankr. N.D.N.Y. 1981).

■ The rent paid by Family Showtime Bay Parkway was the *quid pro quo* for the repeated adjournments it secured of the summary proceeding brought by Toys R Us to evict it from the premises. In the last one, Toys R Us exacted, in return for the adjournments, a commitment that it would be the last and that the eviction proceeding based on its Notice of Termination would go forward promptly. Even absent such express agreements, the acceptance of rent by Toys R Us pursuant to Family Showtime Bay Parkway's promises to provide a schedule of performance

---

**2.** In an Affidavit dated October 7, 1985, Berland stated:

The debtor realizes the seriousness of correcting the elevator problem for I am certain that once the elevators are installed, it will increase business dramatically. The debtor's business is geared primarily to young children. Many parents whose children are in carriages or strollers are reluctant to patronize the Brooklyn location because we do not have the elevators installed as yet. Once we do, it will be a much more attractive location and will entice many young parents whose children are in strollers to come to our restaurant.

(Debtor's Exhibit 8) would not constitute waiver. *Cf. Witkoff v. Shopwell, Inc.,* 112 A.D.2d 295, 491 N.Y.S.2d 740 (2d Dept. 1985) (Acceptance of rent in reliance on assurance of cure does not waive right of termination.)

It is impossible on this record to find intentional waiver by Toys R Us of its rights.

As 11 U.S.C. § 365(c)(3) unambiguously states:

"The trustee may not assume [any] executory contract or unexpired lease of the debtor.... if—

\*     \*     \*     \*     \*     \*

(3) such lease of nonresidential real property has been terminated under applicable nonbankruptcy law prior to the order for relief."

Because this Court concludes that the Lease between Family Showtime Bay Parkway and Toys R Us was terminated by Toys R Us on February 26, 1985, Family Showtime Bay Parkway's motion for relief pursuant to § 365 is denied.

Settle Order.

## ON MOTION FOR STAY PENDING APPEAL

█ Family Showtime Theatres, Inc. ("Family Showtime"), the debtor in these proceedings, has moved the Court pursuant to Bankruptcy Rule 8005 for a stay pending appeal of this Court's Order of October 29, 1986. That Order declared that the debtor's lease for premises at 8973 Bay Parkway, Brooklyn, New York, with Toys "R" Us-Nytex, Inc. ("Toys R Us"), had terminated pre-petition, and could thus not be assumed by the debtor pursuant to § 365 of the Bankruptcy Code, 11 U.S.C. § 365.

The Court based this Order upon two separate opinions in this matter. In the first, *In re Family Showtime Theatres, Inc.,* 58 B.R. 679 (Bankr.E.D.N.Y.1986) (*"Family Showtime I "*), dated January 29, 1986, the Court held that the lease between the two parties gave Toys R Us the right to terminate the lease by sending a Notice of Termination if the tenant had been guilty of an "Event of Default" as defined in the lease. On the question of whether such an "Event of Default" had, in fact, occurred as the result of Family Showtime's failure to construct two elevators on the premises, as it was required to do under the lease, the Court said further proceedings were necessary. By agreement between the parties, such further proceedings were had in the Bankruptcy Court. Following a three day trial, the Court ruled, in an Opinion dated October 9, 1986 ("Family Showtime II"), that the debtor had not attempted to cure the default within 30 days after receiving notice thereof, giving rise to an "Event of Default," and that, in consequence, the lease had been terminated by the "Notice of Termination of Sublease" sent the debtor by Toys R Us prior to the debtor's filing for relief under Chapter 11 of the Bankruptcy Code. On October 29, 1986, the Court issued an Order requiring Family Showtime to vacate the leased premises by November 29, 1986.

Family Showtime has filed a Notice of Appeal from the Court's Order of October 29, 1986. Its position is that the appellate tribunal will have before it for review both Family Showtime I and Family Showtime II. Pending disposition of its appeal, it is requesting, pursuant to Bankruptcy Rule 8005, a stay of this Court's Order of October 29, 1986. It states that as a debtor-in-possession, it cannot supply a supersedeas bond. Its request is opposed by Toys R Us, but is supported by a major creditor, the company which franchises the type of restaurant business conducted by Family Showtime.

What makes this application for a stay particularly troublesome is the fact that unless a stay is granted, Family Showtime will be denied its right of appeal, an integral part of due process. *Cf., Texaco, Inc. v. Pennzoil Co.,* 784 F.2d 1133, 1145 (2d Cir.1986). Without a stay, Family Showtime will probably cease to exist. Not only its ability to reorganize, but its ability to continue operating as a debtor-in-possession, depends upon its continued occupancy

of the premises here involved. Thus, a failure to maintain the *status quo* pending the appeal will render the subsequent disposition of this matter by the district court moot. "It is self-evident that an appeal would be futile if, by the time the appellate court considered the case, the appeal had ... been robbed of any effectiveness." *Texaco, Inc. v. Pennzoil Co., supra,* 784 F.2d at 1154.

Bankruptcy Rule 8005 tracks the general language of Rule 8 of the Federal Rules of Appellate Procedure. Under Rule 8, four factors have been recognized as determinative:

> (1) whether the movant has made a showing of likelihood of success on the merits, (2) whether the movant has made a showing of irreparable injury if the stay is not granted, (3) whether the granting of the stay would substantially harm the other parties, and (4) whether the granting of the stay would serve the public interest.

*Ruiz v. Estelle,* 650 F.2d 555, 565 (5th Cir.1981), *cert. denied,* 460 U.S. 1042 [103 S.Ct. 1438, 75 L.Ed.2d 795] (1983); *accord, Hayes v. City University of New York,* 503 F.Supp. 946, 963 (S.D.N.Y. 1980), *aff'd on other grounds sub nom., Hayes v. Human Resources Administration,* 648 F.2d 110 (2d Cir.1981).

For the reasons already stated, there can be little doubt that as to two, or even three, prongs of this test, the balance of equities tips decidedly in Family Showtime's favor.

In *Family Showtime II,* the Court noted "[T]he Court acknowledges the serious, perhaps mortal, blow to the ability of Family Showtime Bay Parkway to formulate a successful plan of reorganization, repre-

sented by the loss of a leasehold interest constituting one of its principal assets." Irreparable injury, in the absence of a stay, is well nigh incontrovertible.

Furthermore, the potential injury to the debtor far outweighs the harm to Toys R Us should the Court grant the debtor's motion. Toys R Us is currently receiving the full rent reserved under the lease. Although Toys R Us has contended that it could now re-let the premises for twice what Family Showtime is now paying, Family Showtime maintains otherwise.

Finally, to the extent that the issuance of a stay may be viewed as implicating the public interest, the ability of Family Showtime to remain in Chapter 11 and reorganize, will preserve it as an operating company for its creditors and shareholders and carry out the purposes intended to be served by the reorganization provisions of the Bankruptcy Code.

There remains the fourth factor: the likelihood of success on the merits. What Family Showtime is required to show to be entitled to a stay pending appeal is not, as Toys R Us contends, "a strong showing that appellant is likely to prevail on the merits of its appeal," (Memorandum of Law in Opposition to Order to Show Cause for Stay Pending Appeal, p. 4 ("Memorandum")), although some cases use that language. *See, In re Candor Diamond Corp.,* 26 B.R. 844, 847 (Bankr. E.D.N.Y. 1983). What Family Showtime must show is "only that its arguments raise a substantial possibility, although less than a likelihood, of success." *Hayes v. City University of New York, supra,* 503 F.Supp. at 963.[1] This standard, formulated by Judge

---

1. Toys R Us states "that a stay pending appeal is in the nature of a preliminary injunction ..." (Memorandum, p. 4). In *Hayes,* however, Judge Sofaer cogently explained why a lesser standard attaches to a request for post-trial relief than to one for pre-trial relief:

> In the pretrial context, an inquiry as to the likelihood of success on the merits is often one in which both sides have a genuine opportunity to influence the court; because the judge has yet to decide the merits, each side is free to argue that it is more likely than the other to prevail. In the postjudgment context,

the opportunity to influence the court is necessarily more limited; because the judge has ruled, only the side with which he agreed is able to argue persuasively that it is more likely than the other side to succeed on appeal. *This difference in contexts suggests that the party seeking a stay pending appeal should be required to show only that its arguments raise a substantial possibility, although less than a likelihood, of success;* the greater that possibility, the more justifiable is issuance of a stay.

Sofaer in his thorough opinion in that case, received the approval of the Court of Appeals in *Dubose v. Pierce,* 761 F.2d 913, 920 (2d Cir.1985). Other courts have reached the same result. *See, Ruiz v. Estelle, supra,* 650 F.2d at 565, *quoting, Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977):

> The Court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, as in this case, may grant a stay *even though its own approach may be contrary to movant's view of the merits.* The necessary 'level' or 'degree' of possibility of success will vary according to the Court's assessment of the factors. (emphasis added).

It is in light of this standard that this Court has re-examined its two earlier opinions. There is no doubt that the law of New York respecting the difference between a condition subsequent and a conditional limitation is not as clear as a mountain stream. Nevertheless, on the facts of this case, this Court finds it hard to conclude that Family Showtime has a reasonable probability of success on its appeal.

However, it may well be that this Court, because of its long immersion in the dispute, is unable to bring to the matter the necessary objectivity, and that the terms of the lease are less clear than they seem to this Court. Therefore, while this Court is unwilling to stay the effect of its judgment until final disposition of the pending appeal, it believes Family Showtime should have an adequate opportunity to persuade the district court that it has a substantial possibility of success on its appeal.

It is, therefore, ordered, that the Order of this Court, dated October 29, 1986, is hereby stayed, until such time as a judge of the District Court for the Eastern District of New York has had an opportunity to rule on the application of Family Showtime for a stay pending appeal. Such stay is contingent upon the debtor's remaining current on all lease obligations to Toys R

503 F.Supp. at 963 (emphasis added).

Us, and upon its applying, within 20 days, to the District Court for a stay. Except to the extent indicated, the debtor's application for a stay pending appeal is denied.

Settle Order.